# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-IA-00421-SCT

*DON BARRETT, INDIVIDUALLY; BARRETT
LAW OFFICE, P.A. AND LOVELACE LAW FIRM,
P.A.*

*v.*

*JONES, FUNDERBURG, SESSUMS, PETERSON
& LEE, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/26/2008 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LARRY D. MOFFETT |
| | WILTON V. BYARS, III |
| | SHEA STEWART SCOTT |
| ATTORNEYS FOR APPELLEE: | WILLIAM K. DUKE, JR. |
| | GRADY F. TOLLISON |
| | CAMERON MORGAN ABEL |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 11/12/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2008-IA-00788-SCT

*DON BARRETT, INDIVIDUALLY, BARRETT LAW
OFFICE, P.A., AND LOVELACE LAW FIRM, P.A.*

*v.*

*JONES, FUNDERBURG, SESSUMS, PETERSON
& LEE, LLC*

DATE OF JUDGMENT:                 04/16/2008
TRIAL JUDGE:                      HON. WILLIAM F. COLEMAN
COURT FROM WHICH APPEALED:        LAFAYETTE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:         LARRY D. MOFFETT
                                  WILTON V. BYARS, III
                                  SHEA STEWART SCOTT
ATTORNEYS FOR APPELLEE:           WILLIAM K. DUKE, JR.
                                  GRADY F. TOLLISON
                                  CAMERON MORGAN ABEL
NATURE OF THE CASE:               CIVIL - OTHER
DISPOSITION:                      REVERSED AND REMANDED - 11/12/2009
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**CHANDLER, JUSTICE, FOR THE COURT:**

¶1.    The Circuit Court of Lafayette County imposed sanctions against all members of the Scruggs Katrina Group (SKG), a joint venture, along with Don Barrett and Richard Scruggs individually, based upon the misconduct of Richard F. Scruggs, who pleaded guilty to conspiracy to bribe the trial judge in the underlying lawsuit over attorneys' fees.  The SKG co-venturers, including the Scruggs Law Firm, P.A. (the Scruggs Firm); Nutt & McAllister, PLLC (the Nutt Firm); the Barrett Law Office, P.A. (the Barrett Firm); and the Lovelace Law Firm (the Lovelace Firm), along with Don Barrett and Richard Scruggs individually, were defendants in a fee-dispute lawsuit filed by a former co-venturer, the law firm of Jones, Funderburg, Sessums, Peterson & Lee, LLC (the Jones Firm).  The trial court sanctioned the defendants by striking their answer, striking their motion to compel arbitration, entering a default against all defendants, and ordering the defendants to pay the plaintiffs' reasonable attorneys fees and costs incurred since July 17, 2007.

2

¶2.    In these interlocutory appeals, the Barrett Law Office, P.A. (the Barrett Firm); Don Barrett, individually; and the Lovelace Law Firm (the Lovelace Firm) (hereinafter, collectively, "the appellants") argue that: (1) the imputation of Richard Scruggs's bad-faith misconduct to the appellants exceeded the circuit court's inherent power to sanction; (2) the court erred by sanctioning the appellants because Richard Scruggs had acted outside the ordinary course of business of the joint venture; (3) the court's failure to consider lesser sanctions was an abuse of discretion; (4) the sanctions violated the appellants' constitutional rights; (5) the court erred by denying arbitration as a sanction, because the court already had found that the case was subject to mandatory arbitration; (6) the Jones Firm's settlement with Richard Scruggs, the Scruggs Firm, and the Nutt Firm after the entry of the sanctions order also released the appellants as a matter of law.

¶3.    We find that the trial court had the discretionary authority to impose sanctions against SKG based upon the acts of a single partner that occurred in the ordinary course of business of SKG.  However, we conclude that the trial court erred by finding that Richard Scruggs's misconduct occurred in the ordinary course of SKG business.  Therefore, we reverse the order of sanctions against the appellants.  The trial court already has determined that, but for the sanctions, this case is subject to mandatory arbitration.  Therefore, we remand this case for the entry of an order compelling arbitration.

## FACTS AND PROCEDURAL HISTORY

### A.  Preliminary proceedings

¶4.    On March 28, 2007, the Jones Firm filed an amended complaint, alleging that the parties had executed the SKG joint venture agreement in November 2005.  The joint venture

agreement provided that the Scruggs Firm's role was that of lead counsel, the Barrett Firm's role was that of witness development, the Nutt Firm's role was that of funding and client relations, the Jones Firm's role was that of briefing, and the Lovelace Firm's role was that of expert retention and adjuster retention. The agreement provided for the removal of a member of the joint venture by a supermajority vote, consisting of affirmative votes by four of the co-venturers. The Nutt Firm was to provide one million dollars per year in capital contributions, with any further necessary contributions to be paid pro rata by the other co-venturers. The proceeds of the joint venture were to be distributed in the order of capital contributions first, the firms' reasonable out-of-pocket expenses second, and attorneys' fees third. Also, the Nutt Firm was to receive thirty-five percent of the net fee. The distribution was to be made in the following order:

> (1) Reimburse Nutt/McAlister for all expenses paid, (2) Refund all capital contributions, (3) Payment of 35% of net fee to Nutt/McAlister for financing the litigation and for their professional efforts, (4) the remaining 65% of the net fees will be divided among the remaining venturers taking into consideration all factors including Rule 1.5 of the Model Rules of Professional Conduct, and contribution to the success of the litigation.

The joint-venture agreement further provided that "any dispute arising under or relating to the terms of this agreement shall be resolved by mandatory binding arbitration, conducted in accordance with the guidelines of the American Arbitration Association. The site of the arbitration shall be Oxford, MS."

¶5.     In the amended complaint, the Jones Firm alleged that SKG's settlement with State Farm Insurance Company had yielded $26,500,000 in attorneys' fees. The Jones Firm claimed that, despite its performance of the bulk of SKG's most difficult discovery and trial

4

work, Richard Scruggs and Don Barrett had conspired to set the Jones Firm's fee allocation at one million dollars, an unacceptably low percentage. Further, the Jones Firm alleged, upon its refusal of the unfair fee allocation, the other four members of SKG voted to remove it from the joint venture and tendered a check for three percent of the net fees, which the Jones Firm refused. Based upon this conduct, the Jones Firm asserted claims against the co-venturers, and Richard Scruggs and Don Barrett individually, for breach of contract, tortious bad-faith breach of contract, breach of fiduciary duties, usurpation, conversion, intentional interference with prospective business advantage, fraud, constructive trust, conspiracy, and unconscionability. The Jones Firm requested a declaratory judgment that it is entitled to twenty percent of all past and future attorneys' fees collected by SKG. The Jones Firm also requested punitive damages, pre-judgment interest, post-judgment interest, costs, expenses, and reasonable attorneys' fees. The Jones Firm also claimed that the defendants had waived any right to arbitration by repeatedly refusing requests to arbitrate.

¶6.    The defendants answered and filed a motion to stay the proceedings and compel arbitration. They asserted that all of the Jones Firm's claims arose under the joint-venture agreement, and thus were subject to the agreement's provision for mandatory binding arbitration of any disputes arising under or related to the agreement. After a series of filings concerning the arbitration issue, a hearing occurred before Judge Henry Lackey on July 17, 2007.

¶7.    However, on November 29, 2007, Judge Lackey entered an order of recusal, and on December 5, 2007, this Court appointed Judge William F. Coleman to preside over the case. On December 7, 2007, the Jones Firm moved for sanctions against the defendants based upon

5

the November 28, 2007, six-count federal indictment of Richard Scruggs and his law partners, David Zachary Scruggs (Zach Scruggs) and Sidney Backstrom, along with Timothy Balducci of the law firm Patterson and Balducci, PLLC, and Steven Patterson, a nonattorney member of Patterson and Balducci, PLLC.[1]  The indictment charged Scruggs and the other named codefendants, inter alia, with a conspiracy to attempt to influence Judge Lackey to grant the motion to compel arbitration by offering to pay Judge Lackey $40,000 in exchange for a favorable order.

¶8.     In summary, the indictment charged the following.  Between March 15 and March 28, 2007, Richard Scruggs, Zach Scruggs, Balducci, and Patterson met at the offices of the Scruggs Firm to discuss how to influence the outcome of the case.  On March 28, 2007, Balducci met with Judge Lackey and made an overture.  However, Judge Lackey became a cooperating witness for the Federal Bureau of Investigation, and he began assisting their investigation in an undercover capacity.  On May 4, 2004, Backstrom transmitted a proposed order to Balducci, who in turn transmitted it to Judge Lackey.  On September 21, 2007, Balducci and Judge Lackey agreed that Balducci would pay Judge Lackey $40,000 in cash on behalf of Scruggs and the Scruggs Law Firm in exchange for a favorable order.  On September 27, 2007, Balducci delivered $20,000 in cash to Judge Lackey.  On October 18, 2007, Balducci delivered the order to Richard Scruggs and received from Richard Scruggs a $40,000 check and false documentation that cloaked the bribery reimbursement as fees for jury-selection work and preparation of jury instructions in another case.  The same day, Balducci delivered $10,000 to Judge Lackey.  On November 1, 2007, Balducci delivered

---

[1] Neither Balducci nor Patterson ever entered an appearance in the case sub judice.

6

another $10,000 to Judge Lackey. The same day, Balducci and Richard Scruggs discussed making a third $10,000 payment to Judge Lackey; on November 5, 2007, Balducci took hand delivery of the $10,000 check and associated false documentation.

¶9. In the motion for sanctions, the Jones Firm averred that "this entire cause of action and the proceedings that have flowed therefrom have been forever tainted, infected by criminal allegations of corrupt acts of certain Defendants or their agents . . . ." The Jones Firm requested an evidentiary hearing, and if clear and convincing evidence of judicial bribery were presented, the Jones Firm requested that the court impose the following sanctions on all defendants: (1) strike the defendants' answer and their motion to stay proceedings and compel arbitration; (2) enter a default judgment; (3) determine damages; and (4) reimburse the Jones Firm for attorneys' fees related to defending the motion to stay proceedings and compel arbitration.

*B. The trial court's rulings*

¶10. Judge Coleman entered three orders on the pending motions, two of which are the subject of these consolidated appeals. The first order held that the parties were bound to mandatory arbitration of the fee dispute; the second order held that the court was empowered to sanction the defendants by striking the motion to compel arbitration and entering a default judgment; the third order imposed that sanction and the other requested sanctions.

1) The January 15, 2008 order

¶11. After a hearing, on January 15, 2008, Judge Coleman entered an order finding that the motion to compel arbitration should be granted. However, the trial court held referral of the matter to arbitration in abeyance pending resolution of the motion for sanctions. In an

7

accompanying opinion, Judge Coleman found, inter alia, that: (1) the Jones Firm had knowingly entered into the arbitration agreement, (2) the defendants had not waived their right to arbitration, (3) matters arising out of the fee dispute were subject to arbitration, but (4) the motion for sanctions was not within the scope of the arbitration agreement.

### 2) The February 26, 2008 order

¶12.    On February 26, 2008, a hearing occurred on the issue of whether the court has the inherent power to deny arbitration as a sanction for judicial bribery, despite its finding that the issues in the case were otherwise subject to arbitration.  The appellants and the Nutt Firm argued that sanctions could not be assessed against them because they had no knowledge of or culpability in the alleged judicial bribery.  In a February 26, 2008, order, Judge Coleman ruled that the trial court had the authority to strike the defendants' pleadings and enter a default judgment against them as well as the authority to deny referral of the matter to arbitration as a sanction for the alleged judicial bribery.  Judge Coleman further found "that as to the conduct on the part of one or more of the defendants in this matter, the actions for one, if shown to have occurred in the furtherance of the purpose of the joint venture, are the actions for all, and the [c]ourt may order sanctions accordingly."  The trial court ordered an evidentiary hearing on the motion for sanctions and permitted discovery.  On March 13, 2008, the Scruggs defendants[2] filed a petition for an interlocutory appeal of the February 26, 2008, order.  On March 26, 2008, the appellants and the Nutt Firm filed a joinder in the petition for an interlocutory appeal.

### 3) The April 16, 2008 order

---

[2]The Scruggs defendants include Richard Scruggs and the Scruggs Firm.

¶13. At the April 15-16, 2008, hearing on the motion for sanctions, it was established that in the United States District Court for the Northern District of Mississippi, Richard Scruggs, Backstrom, Balducci, and Patterson all had pleaded guilty to conspiracy to commit bribery of an elected state official, that Zach Scruggs had pleaded guilty to misprision of a felony, and that all were awaiting sentencing. No members of the other defendant law firms had been charged in the bribery investigation.

¶14. In his testimony before Judge Coleman, Richard Scruggs invoked his rights under the Fifth Amendment. Judge Lackey testified that he initially was contacted by Balducci and had several subsequent interactions with him; at one point, Balducci gave him a proposed order compelling arbitration as to all the defendants. During one such interaction, Balducci told Judge Lackey that "they" had decided to change tactics to delay the entry of the proposed order, and Judge Lackey had assumed that "they" referred to the four other SKG firms. However, Judge Lackey testified that Balducci never told him that Barrett, Nutt, Lovelace, or anyone at their firms knew anything about his contact with Judge Lackey. In fact, Judge Lackey testified, Balducci later told Judge Lackey that the only persons who knew about the scheme were himself, Judge Lackey, and Richard Scruggs.

¶15. David Nutt testified that he lacked any knowledge of the attempted bribery scheme until the day after the indictments. Nutt further testified that before the bribery allegations, all the defendants had been represented by the law firm of Daniel, Coker, Horton, and Bell, but they had no joint defense agreement. However, Nutt admitted that all defense fees had been advanced by the Nutt Firm on behalf of the other codefendants. Nutt testified that

Richard Scruggs had not been authorized to hire attorneys to act on behalf of the other defendants.

¶16.   Nutt also testified that the Nutt Firm had paid a $40,000 invoice for voir dire services performed by Balducci in an SKG case referred to in the record as *Lisanby v. USAA*. *Lisanby* was one of several SKG cases that were handled exclusively by the Scruggs Firm, but at the time the Nutt Firm was billed for voir dire, *Lisanby* had not gone to trial.  The $40,000 invoice was among many invoices attached to a manifest for $750,000 in SKG expenses submitted by the Scruggs Firm in November 2007 for payment by the Nutt Firm. In fact, the $40,000 invoice was a falsified invoice that billed the bribe money to SKG.  Nutt testified that he had not seen the invoice when it arrived, but, apparently, his law partner had approved the invoice for payment along with the rest of the items in the manifest.  Nutt testified that after the bribery charges arose, he located the invoice and contacted the FBI. Nutt further testified that the invoice had appeared to be a reasonable charge, and that his firm had had nothing to do with the *Lisanby* case.

¶17.   Dewitt Lovelace testified that he never had authorized any ex parte contact with Judge Lackey.  Lovelace testified that he had lacked any knowledge of the attempted bribery until he saw the indictments, and that he never had authorized any of the other defendants to act on his behalf.  Lovelace further testified that he never paid any defense fees to Daniel Coker, and he never requested that the case go to arbitration.  Following this testimony, the parties

stipulated that Don Barrett's testimony would be substantially the same as that of Nutt and Lovelace.[3]

¶18.   In a bench ruling, Judge Coleman found that in March 2007, Balducci had met with members of the Scruggs Firm and had agreed to influence Judge Lackey for a favorable decision in the Jones case.  Judge Coleman further found that this attempt to influence developed into a conspiracy among Richard Scruggs, Zach Scruggs, Backstrom, Balducci, and Patterson to bribe Judge Lackey, which was carried out.  However, Judge Coleman found that "there is little, if any, evidence that the other defendants participated or were aware of the bribe or part of the conspiracy."

¶19.   Noting that no motion for reconsideration had been made, Judge Coleman refused to reconsider his prior ruling "that as to the conduct on the part of one or more of the defendants in this matter, the actions for one, if shown to have occurred in the furtherance of the purpose of the joint venture, are the actions for all, and the [c]ourt may order sanctions accordingly." Judge Coleman found that, although the complaint listed individual defendants, the Jones Firm's lawsuit was against SKG itself, or against its assets.  Notwithstanding, Judge Coleman granted the motion for sanctions against all defendants, struck the defendants' pleadings and answer, and entered default in favor of the Jones Firm.

¶20.   In an April 17, 2007, order, Judge Coleman struck the defendants' answer and their motion to stay proceedings and compel arbitration, and entered default against them.  Judge Coleman ordered a hearing to take an account and to determine the amount due the Jones Firm

---

[3]The trial court previously had sustained an objection to the admission of Don Barrett's affidavit.

11

under the joint-venture agreement. At the hearing, the defendants would be permitted to raise legal issues such as whether the facts established a legal basis for recovery. Judge Coleman allowed discovery on the issue of the Jones Firm's damages, including its claim for punitive damages. Additionally, Judge Coleman ordered the defendants to pay the Jones Firm's reasonable attorneys' fees and expenses incurred since July 17, 2007, until the date of the order, without prejudice to the Jones Firm's claim for attorney's fees in the first amended complaint.

¶21. On May 1, 2008, the Scruggs defendants moved to supplement their petition for an interlocutory appeal to include the April 16, 2008, order. On May 7, 2008, the Barrett Firm, Don Barrett, the Nutt Firm, and the Lovelace Firm filed a petition for an interlocutory appeal, later joined by the Scruggs Firm, from the April 16, 2008, order. On June 4, 2008, a panel of this Court denied the petition, but on motion for reconsideration, on August 14, 2008, this Court, sitting en banc, granted the petition for an interlocutory appeal and stayed all proceedings in the trial court. On August 25, 2008, the Jones Firm and the Scruggs Firm filed a "Joint Motion to Partially Lift Stay and to Dismiss Certain Parties to Appeal," and stated that the Jones Firm had settled with the Nutt Firm, Richard Scruggs, and the Scruggs Firm. This Court granted the joint motion. Accordingly, the remaining appellants are the Barrett Firm, Don Barrett, and the Lovelace Firm. This Court granted the appellants' motion to consolidate the interlocutory appeals.

## STANDARD OF REVIEW

12

¶22. "This Court reviews a trial court's imposition of sanctions for abuse of discretion." *Wyssbrod v. Wittjen*, 798 So. 2d 352, 357 (Miss. 2001). On review of the sanctions imposed in *Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385, 1388 (Miss. 1997), this Court stated:

> When this Court reviews a decision that is within the trial court's discretion, it first asks if the court below applied the correct legal standard. *Burkett v. Burkett*, 537 So. 2d 443, 446 (Miss. 1989). If the trial court applied the right standard, then this Court considers whether the decision was one of several reasonable ones which could have been made. *Id.* This Court will affirm a trial court's decision unless there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors." *Cooper v. State Farm Fire & Cas. Co.*, 568 So. 2d 687, 692 (Miss. 1990).

## DISCUSSION

¶23. This Court confines its discussion to the appellants' first two issues, which are dispositive of this appeal.

I. WHETHER THE IMPOSITION OF SANCTIONS AGAINST THE APPELLANTS EXCEEDED THE TRIAL COURT'S INHERENT POWERS.

¶24. At issue is the trial court's finding "that as to the conduct on the part of one or more of the defendants in this matter, the actions for one, if shown to have occurred in the furtherance of the purpose of the joint venture, are the actions for all, and the [c]ourt may order sanctions accordingly." The appellants argue that, absent a finding of bad faith personal to the party to be sanctioned, a court lacks the inherent power impose a sanction on that party. In other words, the appellants argue, a court may not use vicarious liability to sanction an innocent party through the imputation of bad faith to that party.

¶25. A court has the inherent power to impose sanctions in order to protect the integrity of the judicial process. *Wyssbrod*, 798 So. 2d at 368. Mississippi's court rules and statutes

13

specifically provide for the imposition of sanctions against parties or attorneys appearing before the court; under these rules the court may: order the payment of money to a party or an attorney; strike pleadings; enter a default; or set aside a judgment. *See* Miss. R. Civ. P. 11(b), 37(b), 41(b), and 60(b). Of particular relevance in this case, Uniform Rule of Circuit and County Court Practice 1.10 provides that "no person shall undertake to discuss with or in the presence or hearing of the judge the law or the facts or alleged facts of any case then pending in the court or likely to be instituted therein, . . . nor attempt in any manner, . . . to influence the decision of the judge in any such case or matter." Uniform Rule of Circuit and County Court Practice 1.03 provides that any person embraced by the rules who violates any provision of the rules "may be subjected to sanctions, contempt proceedings, or other disciplinary actions imposed or initiated by the court."

¶26. The appellants contend that a court's inherent power to sanction arises upon a showing that the party to be sanctioned acted in bad faith, and that bad faith cannot be imputed to another party through the doctrine of vicarious liability. The Jones Firm counters that there was evidence before the trial court that the appellants had constructive notice of the criminal acts, because the $40,000 in bribe money was reimbursed from joint-venture funds; thus, there was evidence that they acted in bad faith. Nonetheless, the trial court rejected this evidence, concluding that there was "little, if any" evidence the appellants had knowledge of the bribery conspiracy, and the court ordered sanctions based upon the vicarious liability of joint venturers. Although the Jones Firm does not challenge this finding by the trial court, this Court has held that "where the basis for the award is itself a product of abused discretion, so too is the award." ***Ford Motor Co. v. Tennin***, 960 So. 2d 379, 395 (Miss. 2007). We find that

14

the trial court's refusal to attribute knowledge of the bribery conspiracy to the appellants was not manifestly erroneous; therefore, the finding was within the court's discretion. For that reason, this Court proceeds to review the trial court's decision to award sanctions based upon vicarious liability.

¶27. The appellants essentially argue that the trial court applied an incorrect legal standard by imposing sanctions upon them based upon their status as joint venturers with the Scruggs Firm. They cite the rule that a federal court may not, in the exercise of its inherent powers, order attorney's fees as a sanction without a finding that the opposing party personally has acted in bad faith. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765-66, 100 S. Ct. 2455, 2463-64, 65 L. Ed. 2d 488 (1980); *Alyeska Pipeline Inc. v. Wilderness Soc'y*, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 1622-23, 44 L. Ed. 2d 141 (1975); *Hall v. Cole*, 412 U.S. 1, 5, 93 S. Ct. 1943, 1946, 36 L. Ed. 2d 702 (1973). They also cite cases that hold a judicial finding that a plaintiff or defendant acted in bad faith in litigation does not permit the court to impose sanctions against that party's innocent attorney, or against that party's innocent coplaintiff or codefendant. *Dow Chem. Pacific, Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 344 (2d Cir. 1986) (stating that "[a] finding that one defendant has acted in bad faith in conducting litigation does not justify an award of fees against a codefendant"); *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F. 2d 1078, 1089 (2d Cir. 1977) (stating "[s]ince an award of costs or attorneys' fees based on bad faith must likewise be personal, such an award may be assessed against plaintiffs . . . only after reconsideration and such hearing as the district court finds necessary, that they personally were aware of or otherwise responsible for the procedural action instituted in bad faith"); *Bower v. Weisman*, 674 F. Supp. 109, 112 (S.D.N.Y. 1987)

15

(the plaintiff's counsel could not be assessed sanctions based upon the plaintiff's perjury because there was no showing that counsel knew of, or aided the plaintiff in, the perjury); *Arista Records, LLC v. Tchirhart*, 241 F.R.D. 462, 464-65 (W.D. Tex. 2006) (citing *Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990)) (a party's bad-faith discovery violation, consisting of the destruction of evidence, could not be attributed to her attorney).  These authorities stand for the tenet that bad faith is personal and cannot be attributed to the acting party's attorney or to another party.

¶28.    The federal courts have recognized that a court may, pursuant to its inherent powers, impose a sanction upon a partnership based upon its vicarious liability for a partner's litigation misconduct.  *Perna v. Electronic Data Systems Corp.*, 916 F. Supp. 388, 402-03 (D.N.J. 1995).  In *Eppes v. Snowdon*, 656 F. Supp. 1267 (D. Ky. 1986), the district court ordered sanctions against a silent partner, Doherty, based upon a fraud upon the court committed by his partner, Snowdon, in the defense of a declaratory judgment action by an insurer.  *Id.* at 1282.  Doherty and Snowdon were partners who owned a thoroughbred stallion covered by policies of mortality insurance.  *Id.* at 1268.  When the stallion died, the insurer sought a declaratory judgment for purposes including establishing the stallion's cash value at the time of his death.  *Id.*  The court declared a mistrial after discovering that Snowdon had produced fraudulent letters from prominent horse dealers who had offered to buy a share in the stallion.  *Id.* at 1269, 1272-73.  Snowdon had offered these letters to establish the stallion's high cash value at his death.  *Id.* at 1269.  These letters were dated before the horse's death, but witnesses established that at least two of the letters were written after the horse's death and backdated

16

at Snowdon's direction. *Id.* Snowdon also had coached one letter's author to lie during a hearing concerning the letter's authenticity. *Id.* at 1276.

¶29.   The trial court determined that Snowdon's manufacture of false evidence constituted a fraud upon the court that authorized the court to dismiss his answer and counterclaim pursuant to the court's inherent power to protect the integrity of judicial proceedings. *Id.* at 1279. The court then addressed the question of whether the acts of Snowdon could be imputed to his partner, Doherty. *Id.* at 1279-81. Doherty had given Snowdon a general power of attorney authorizing him to transact business on his behalf and to institute or defend suits concerning his property rights. *Id.* at 1270. Doherty had not participated in the litigation and he had not appeared at the trial due to illness. *Id.* Defense counsel had informed the court that, at the trial, Doherty's interests would be represented by Snowdon. *Id.*

¶30.   After reviewing the Uniform Partnership Act and Kentucky law, and citing the fact that Snowdon and Doherty were partners in the stallion, the court "ha[d] no doubt that the acts of Snowdon must be imputed to his partner, Doherty, who has remained a silent partner throughout." *Id.* at 1280. The court noted that because Snowdon was Doherty's partner, agent, and attorney-in-fact, Doherty could not expect to reap any benefits of Snowdon's activities in the litigation without also being held accountable for Snowdon's misdeeds. *Id.* at 1280-81. The court attributed particular importance to the fact that there was nothing before the court to rebut the inference that Doherty had acquiesced in Snowdon's misdeeds with full knowledge. *Id.* at 1270. The court struck the partners' answer and counterclaim, and imposed monetary sanctions on Snowdon. *Id.* at 1282. However, in its discretion, the court found that it would be inequitable to impose monetary sanctions on Doherty, because Snowdon was the active partner

17

in the commission of the fraud on the court, and Doherty had taken no affirmative action at any time in purchasing the stallion, in filing the insurance claim, or in the litigation. *Id.* at 1280.

¶31. A joint venture is a single-purpose partnership. ***Duggins v. Guardianship of Washington***, 632 So. 2d 420, 427 (Miss. 1993).[4] As a joint venture, SKG was governed by Mississippi's partnership law, the Uniform Partnership Act of 1997, effective January 1, 2005.[5] Under the Act, a joint venture is liable for any penalty incurred as the result of a wrongful act or omission, or other actionable conduct, of a joint venturer acting in the ordinary course of business of the joint venture. Miss. Code Ann. § 79-13-305 (Rev. 2009). In the absence of an agreement with the claimant or as otherwise provided by law, all co-venturers are jointly and severally liable for joint-venture obligations. Miss. Code Ann. § 79-13-306(b) (Rev. 2009). A litigant may sue a joint venture "in the name of the partnership" or he may bring an action against "any or all of the partners in the same action or in separate actions." Miss. Code Ann. § 79-13-307(a),§ 79-13-307 (b) (Rev. 2009). However, a judgment against a partnership may not be satisfied from a partner's assets unless there is also a judgment against the individual partner. Miss. Code Ann. § 79-13-307(c) (Rev. 2009).

---

[4] The Court in ***Duggins*** specified that "the only purpose in distinguishing a joint venture from a partnership is to define a business relationship which is limited to specific undertakings for profit, rather than a general and continuing business of a particular kind." ***Duggins***, 632 So. 2d at 427. "In simplest form, a joint venture can be defined as a single purpose partnership, whereby the joint venturers undertake a single project for profit." *Id.*

[5] Before January 1, 2007, the Uniform Partnership Act of 1997 applied to all partnerships formed after January 1, 2005; after January 1, 2007, the revised Act applies to all partnerships. Miss. Code Ann. § 79-13-1205 (Rev. 2009). Therefore, the revised Act applies to SKG.

¶32. We find that the trial court's treatment of this lawsuit as one against SKG or SKG assets was not an abuse of discretion. The lawsuit was an attempt by the Jones Firm to obtain what it asserted to be its rightful share of joint-venture profits under the joint-venture agreement. Rather than suing SKG, the Jones Firm chose to sue the co-venturers, a litigation strategy encouraged by Mississippi Code Section 79-13-307(c), and two individuals who were not co-venturers. Given the facts that: (1) under Section 79-13-307(c), a partnership creditor must sue an individual partner in order to obtain a judgment against the individual partner's assets; (2) accordingly, the trial court found that this suit was against SKG or SKG assets brought in the name of SKG's partners; (3) partners are jointly and severally liable for partnership obligations; and (4) under Section 79-13-305, a partnership may be liable for "any penalty" incurred as a result of the wrongful act or actionable conduct by a partner in the ordinary course of partnership business; thus, this Court finds that the trial court possessed the discretion to sanction SKG, but only upon a finding that Richard Scruggs's misconduct was within the ordinary course of business of SKG. We proceed to review the trial court's implicit finding that the misconduct occurred within SKG's ordinary course of business.

II. WHETHER RICHARD SCRUGGS'S WRONGFUL ACTS WERE IN THE ORDINARY COURSE OF BUSINESS OF THE JOINT VENTURE.

¶33. Under Mississippi Code Section 79-13-305, a partnership is liable for "loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with authority of the partnership." Mississippi Code Section 79-13-302(1) provides that:

Each partner is an agent of the partnership for the purpose of its business.
An act of a partner, including the execution of an instrument in the partnership

19

name, for apparently carrying on in the ordinary course the partnership business or business of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing knew or had received a notification that the partner lacked authority.

Miss Code Ann. 79-13-302(1) (Rev. 2009). It is undisputed that Richard Scruggs's misconduct was not actually authorized by SKG, and there is no assertion that he acted with apparent authority under Section 79-13-302(1). Therefore, we confine the discussion to vicarious liability under Section 79-13-305, under which a partnership is liable for "any penalty" incurred by a partner's misconduct committed in the ordinary course of business of the partnership. This Court is guided by several cases in which a trial court exercised its discretion to decide whether to hold an innocent partner liable for damages or judicial sanctions based upon another partner's misconduct.

¶34. The Jones Firm cites *Duggins v. Guardianship of Washington*, 632 So. 2d 420 (Miss. 1993). In *Duggins*, an attorney, Duggins, associated another attorney, Barfield, to represent a guardianship in a medical-malpractice suit. *Id.* at 422-23. The two attorneys agreed that they would divide the fees equally. *Id.* at 423. Duggins's role was to compile medical records and medical bills and maintain contact with the client; Barfield was to draft and file the complaint, arrange for expert witnesses, and attempt to negotiate with the defendant's insurer. *Id.* at 423. However, Barfield made material misrepresentations to Duggins and the client and misappropriated settlement funds, for which he eventually was disbarred and convicted of a felony. *Id.* at 423-25. A chancellor determined that Barfield and Duggins were liable to the guardianship in tort and for breach of contract, and that Duggins was vicariously liable for Barfield's misconduct because it was committed in the scope of the partnership. *Id.* at 426. In

20

addition to compensatory damages, the chancellor ordered Barfield and Duggins to pay punitive damages and attorney's fees. *Id.* at 426. On appeal, Duggins contended that, like the client, he was but an innocent victim of the nefarious Barfield and, thus, he could not be held vicariously liable for Barfield's misconduct. *Id.* at 429.

¶35. This Court affirmed. We first determined that the legal relationship between Duggins and Barfield constituted a joint venture governed by the Uniform Partnership Act. *Id.* at 427. We then examined the Uniform Partnership Act's provisions governing a partnership's liability to third parties.[6] *Id.* at 427. The court examined Section 79-12-17(1), the prior version of Section 79-13-301(c), and Section 79-12-25, the prior version of Section 79-13-305.[7] The Court found that Barfield's misconduct was imputable to Duggins under the Uniform Partnership Act because the misconduct was "well within" the scope of the joint venture's business. *Id.* at 428. The Court found that "Barfield's actions were committed while in the furtherance of the partnership and was certainly within the partnership business. The handling of client funds is clearly within the realm of an attorney's representation of a guardianship in a legal action." *Id.* Thus, the Court determined that Duggins was vicariously liable for Barfield's actions. *Id.* The Court further found Duggins vicariously liable for punitive damages, stating:

> If the partner acted within the course and scope of actual or apparent authority, then even liability for fraudulent wrongs can be imputed to the partnership. The other partners, though innocent without knowledge of the act or omission, can be vicariously liable . . . . [Prior cases] found punitive damages appropriate against an

---

[6] The Uniform Partnership Act relied upon in *Duggins* was repealed on January 1, 2007.

[7] The Uniform Partnership Act of 1997 did not substantially alter the provisions cited in *Duggins* as they pertain to the issues of partnership liability presently under review.

21

innocent partner for actions done by another partner while engaged in work within the scope of the partnership.

*Id.* at 429-30 (citations omitted).

¶36. However, in affirming the damages assessed against Duggins, this Court did not solely rely upon partnership principles, but also upon the chancellor's finding that Duggins was guilty of omissions that had contributed to the guardianship's loss of assets. *Id.* at 429. We noted that the guardianship had relied on Duggins, as well as Barfield, to pursue its interests, and the chancellor recognized that "there were sufficient 'red flags' which should have caused Duggins to realize that something was amiss." *Id.* Therefore, we stated, in addition to Barfield's misdeeds, "Duggins' negligence and inaction in investigating Barfield's suspicious conduct allowed the guardianship to be stripped of all its assets." *Id.*

¶37. The appellants cite ***Idom v. Weeks & Russell***, 135 Miss. 65, 99 So. 761 (1924). In ***Idom***, the sheriff of the town of Ackerman rallied the citizenry after two burglaries and a sighting of suspicious characters. *Id.* at 74, 99 So. at 762. Weeks and Russell were partners who owned and operated a drug store, and Russell, without Weeks's knowledge or authorization, decided to lie in wait overnight at the store with a gun in case burglars tried to break in. *Id.* at 73-74, 99 So. at 762. Tragically, Russell shot and killed Idom, an innocent person who was checking on the store. *Id.* at 74, 99 So. at 762.

¶38. In a suit by Idom's widow against Russell and Weeks, this Court held that, while Russell was liable for the killing, his partner, Weeks, was not liable because Russell had not acted in furtherance of partnership business. *Id.* at 76-77, 99 So. at 763-64. The Court reviewed the rules pertaining to a partner's liability for the acts of another partner. *Id.* at 76-79, 99 So. at 763-64.

22

The Court stated that whether a partner is so liable is governed by the law pertaining to principal and agent, such that:

> If the act or tort of the partner be committed while he is engaged in the partnership business, and is in furtherance of the interest of the partnership, then the partnership and all partners are liable. . . . If a tort be committed by one partner while engaged in a transaction within the scope of the partnership business, and such tort be committed in furtherance of the interests of the partnership, it will be liable. But it will not be liable for a tort committed by one partner in a transaction outside of the partnership business, where he acts from his own private malice or ill will, unless the act which constituted the tort was authorized by the members of the partnership, or subsequently ratified by them; the act itself having been done in their behalf and interest.

*Id.* at 76-77, 99 So. at 763 (citations omitted). The Court defined "course of business" as "what is usually done in the management of trade or business." *Id.* at 78, 99 So. at 764 (citation omitted).

¶39. The Court determined that Russell's act of lying in wait for burglars at the partnership's drug store emanated from his own private malice or ill will and was not within the scope of the partnership's business. *Id.* at 78, 99 So. at 764. There was testimony that, after the shooting, Russell told the sheriff that he was in the store for the purpose of trying to capture the burglars; he mentioned no intent to protect the partnership's property. *Id.* at 76, 99 So. at 763. From this, the Court concluded that "[a]ccording to this statement of Russell his dominant purpose was not for the preservation of the partnership property but rather to try and capture the burglars." *Id.* The Court found that the scope of the partnership business did not contemplate that one partner, when the place of business is closed for the night, should conceal himself inside the store for the purpose of capturing burglars. *Id.* at 78, 99 So. at 763-64.

23

¶40.    Similarly, in *Perna v. Electronic Data Systems Corp.*, 916 F. Supp. 388, 402-03 (D.N.J. 1995), a federal district court declined to sanction a partnership for the unethical conduct of one partner because the partner's behavior was outside the scope of the partnership's business.  The partnership was a plaintiff in litigation.  *Id.* at 391.  During a visit by defense counsel to the partnership's premises, the partner surreptitiously viewed and photocopied documents in defense counsel's briefcase.  *Id.* at 392-93.  The partner stated that he had committed the misconduct to protect his own interest.  *Id.* at 402.  As in this case, no other partners authorized the misconduct. *Id.*  Further, as in this case, the defendant urged sanctions against the partnership because the partner's misconduct was in the furtherance of the partnership's interest and was in the ordinary course of partnership business.  *Id.* at 402.  The defendant demanded the sanction of dismissal of the partnership's lawsuit.  *Id.*

¶41.    While the district court sanctioned the individual partner for fraud on the court, the court declined to sanction the partnership.  *Id.*  The district court found that the partner's misconduct had been motivated by a desire to protect his own interest and his own individual claim.  *Id.* Therefore, the district court concluded, the partner's "extraordinary behavior was outside the scope of the business and was an individual act."  *Id.*  The district court stated that "dismissal of the partnership's claim without a demonstration of an intentional and willful conduct on the part of the entire partnership is too severe a sanction."  *Id.* at 403.

¶42.    We turn to the facts at hand.  The SKG joint-venture agreement specified that the joint venture's purpose was to "bring a number of lawsuits on behalf of individuals and businesses who were wrongfully denied insurance coverage for property damage arising out of Hurricane Katrina."  SKG earned $26.5 million in profits from the Katrina litigation.  When a fee dispute

arose, SKG ousted the Jones Firm, resulting in its suit against SKG's remaining co-venturers for a share of the joint-venture profits. When the Jones Firm sued, the remaining co-venturers hired attorneys and filed a motion to compel arbitration pursuant to the joint-venture agreement's arbitration clause. As with other SKG expenses, the Nutt Firm advanced the defense fees, and the testimony of Lovelace and of Barrett, by stipulation, indicates that some co-venturers/codefendants made the strategic decision on behalf of all the co-venturers/codefendants to file a motion to compel arbitration. Subsequently, Richard Scruggs pleaded guilty to a conspiracy to bribe the trial judge to enter an order granting the motion to compel arbitration. Members of the other co-venturer law firms testified that they lacked any knowledge of the conspiracy and did not authorize or ratify it.

¶43. The record aptly demonstrates that the scope of SKG's business did not contemplate an attempted bribery of the trial judge. *See id.* at 78, 99 So. at 763-64. This unauthorized criminal act constituted extraordinary behavior outside the ordinary course of SKG business and amounted to an act of "private malice or ill will" equivalent to the conduct in ***Idom***. There was no evidence that Scruggs intended, by this act, to benefit SKG; in fact, the Nutt Firm, having been allotted thirty-five percent of the net fee by the joint-venture agreement, could not have lost its share of the net fee at a trial over the division of the remaining sixty-five percent. Because the misconduct of Richard Scruggs was outside the ordinary course of SKG business, the trial court abused its discretion in finding otherwise. Moreover, unlike in ***Duggins***, there was no evidence of "red flags" that should have alerted the Barrett Firm, Don Barrett, or the Lovelace Firm to Scruggs's activities. Because there was no basis for sanctioning the appellants, we reverse the order imposing sanctions upon them.

25

¶44. The trial court erred by sanctioning the appellants because Richard Scruggs's wrongful acts did not occur in the ordinary course of SKG business. Because the trial court already has ruled that, but for the sanctions, this case is subject to mandatory arbitration, we reverse the order of sanctions and remand this case for the entry of an order compelling arbitration.

¶45. **REVERSED AND REMANDED.**

**WALLER, C.J., GRAVES, P.J., RANDOLPH AND LAMAR, JJ., CONCUR. CARLSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY PIERCE, J. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY CARLSON, P.J. DICKINSON AND KITCHENS, JJ., NOT PARTICIPATING.**

**CARLSON, PRESIDING JUSTICE, DISSENTING:**

¶46. I agree with the majority inasmuch as "the trial court possessed the discretion to sanction SKG, but only upon a finding that Richard Scruggs's misconduct was within the ordinary course of business of SKG." (Maj. Op. at ¶ 33). However, as to issue two, concerning whether Scruggs was acting in the ordinary course of business, I must disagree with the majority's conclusion that Scruggs was not acting in furtherance of SKG.

¶47. Vicarious liability falls under the auspices of Section 79-13-305(a), which states:

> A partnership is liable for loss or injury caused to a person, or for a penalty incurred, as a result of a wrongful act or omission, or other actionable conduct, of a partner acting in the ordinary course of business of the partnership or with authority of the partnership.

Miss. Code Ann. § 79-13-305(a) (Rev. 2009). I do not interpret this statute as implying that the other partners need have knowledge (actual or constructive) of the wrongful or actionable conduct to be held liable – so long as the wrongdoer has acted in the ordinary course of business of the

26

partnership. I believe ***Duggins v. Guardianship of Washington Through Huntley***, 632 So. 2d

420 (Miss. 1993), is in accord with this premise, because this Court clearly stated therein:

"[O]ther partners, though innocent without knowledge of the act or omission, can be vicariously

liable." ***Id.*** at 429. Unlike the majority, I do not interpret the holding in ***Duggins*** as having also

relied on the fact that Duggins should have known of his partner's malfeasance due to the

presence of "red flags." The majority interprets ***Duggins*** as follows:

> [I]n affirming the damages assessed against Duggins, this Court did not solely rely
> upon partnership principles, but also upon the chancellor's finding that Duggins
> was guilty of omissions that contributed to the guardianship's loss of assets. We
> noted that the guardianship had relied on Duggins, as well as Barfield, to pursue
> its interests, and the chancellor recognized that "there were sufficient 'red flags'
> which should have caused Duggins to realize that something was amiss."
> Therefore, we stated in addition to Barfield's misdeeds, "Duggins' negligence and
> inaction in investigating Barfield's suspicious conduct allowed the guardianship
> to be stripped of all its assets."

(Maj. Op. at ¶ 37) (quoting ***Duggins***, 632 So. 2d at 429) (internal citations omitted). I submit that

what the majority quotes as the holding in ***Duggins*** is merely dicta, and that the holding of the

case is not premised on Duggins's negligence. A plain reading of the statute does not lend itself

to an interpretation that actual or constructive knowledge of the wrongful conduct is required for

liability to attach. "In considering a statute passed by the legislature, . . . the first question a court

should decide is whether the statute is ambiguous. If it is not ambiguous, the court should simply

apply the statute according to its plain meaning and should not use principles of statutory

construction." ***Miss. State Univ. v. People for Ethical Treatment of Animals, Inc.***, 992 So. 2d

595, 606-07 (Miss. 2008) (quoting ***Estate of Klaus v. Vicksburg Healthcare, LLC***, 972 So. 2d

555, 556 (Miss. 2007)).

27

¶48.    That having been said, even if this Court is prepared to hold in today's case that an innocent partner can be held liable for the acts of another only if the circumstances are such that "there were sufficient red flags," then I wish to point out that the $40,000 used in the bribery scam was paid out by SKG to Richard Scruggs under the pretense that Richard Scruggs owed $40,000 to Timothy Balducci for voir dire services in the *Lisanby* case, a Katrina case which had never been tried. I am persuaded by the Jones Firm's argument that this fabricated invoice for a case that had never been tried was sufficient notice to SKG, its associated firms, and the respective partners of those firms that something was amiss.

¶49.    Moreover, Richard Scruggs did not act on his own behalf in concocting this bribery scheme but on behalf of all the remaining associated firms in SKG. The testimony by Judge Lackey indicated that the *quid pro quo* in this scheme was to be an exchange of $40,000 for a ruling from Judge Lackey in favor of SKG's motion to compel arbitration. This ruling would have been favorable as to all the SKG defendants – not Scruggs alone. "If a tort be committed by one partner while engaged in a transaction within the scope of the partnership business, and such tort be committed in furtherance of the interests of the partnership, it will be liable." *Idom v. Weeks & Russell*, 135 Miss. 65, 76-77, 99 So. 761, 763 (1924). This bribery attempt, albeit a fraud upon the court, was committed in furtherance of the interests of all the SKG firms. Had this bribery attempt succeeded with an unscrupulous judge, then presumably SKG stood also to reap the benefit of a favorable ruling in arbitration proceedings against the Jones Firm – retaining all of the disputed profits that perhaps rightly belonged to the Jones Firm and lining all of the pockets of the SKG firms and their respective partners. Surely, if this were the scenario and the bribe had been successful, this Court would not then say the arbitration ruling should stand. In fact,  I

28

submit that this Court would unhesitatingly agree that such a judgment must be set aside. Why then are we saying a trial judge abused his discretion in striking an answer and motion – a motion that was accompanied by an attempted fraud upon the court?

¶50. The majority relies on the holding in *Idom v. Weeks & Russell*, 135 Miss. 65, 99 So. 761 (1924), wherein the Court held that Weeks was not liable for his partner Russell's act of lying in wait within the drug store for burglars and subsequently shooting an innocent passerby. *Id.* at 764. The *Idom* holding was premised on the fact that Russell's lying in wait and disposing of burglars was outside of the scope of the partnership agreement between Weeks and Russell to own and operate a drug store. *Id.* at 763-64. According to *Idom*, the shooting constituted an act of "private malice or ill will" on the part of Russell. *Id.* at 764.

¶51. The majority likens Scruggs's conduct to that depicted in *Idom* because it was an "unauthorized criminal act" outside of SKG's ordinary course of business that amounted to "private malice or ill will." (Maj. Op. at ¶44). The majority neglects to see the mutual benefits in the form of retained profits that would have been bestowed upon the Scruggs firm and the Barrett and Lovelace firms alike had the bribery attempt not been brought to light by an honorable whistle-blower in Judge Lackey. I submit that had Russell been engaging in dispensing medication to a patron without a prescription, albeit a criminal act, then this Court in *Idom* would have held that there was partnership liability, since Russell's criminal act would have had a mutual benefit to the partnership in the form of increased revenue. Scruggs's conduct was to protect all the coffers of SKG – not just his own. After all, the ordinary course of business for lawyers on the most basic level is that lawyers are in the business of winning – arguing for and receiving favorable rulings from trial judges. Such was the intention of Scruggs in the course of

29

his self-confessed criminal act – the $40,000 was to secure a favorable ruling to compel arbitration – a ruling from which each and every SKG firm stood to benefit.

¶52. Accordingly, with the utmost respect for my esteemed colleagues in the majority, I must respectfully dissent, because I would not find an abuse of discretion on the part of the trial judge in imputing Scruggs's criminal conduct to the remaining SKG defendants. I believe that sanctions were properly imposed in today's case, and I would thus affirm the trial court, *in toto*.

**PIERCE, J., JOINS THIS OPINION IN PART.**

**PIERCE, JUSTICE, DISSENTING:**

¶53. I respectfully dissent from the majority because I believe the partnership should be responsible for the dealings of one of its partners in this instance. I concur in part with the analysis by Justice Carlson in his dissent concerning the $40,000 payment. I believe that this payment to Timothy Balducci for voir dire services on a case that had not yet gone to trial was a red flag that should have been noticed. I disagree with the Carlson dissent that partners are liable for all actions completed in the course of the partnership, because there may be many situations where an innocent partner should not be held accountable for the intentional and/or criminal behavior of another partner. However, such is not the case here.

¶54. Regardless of the amount of fees paid out by SKG, a $40,000 bill paid out for voir dire services on a case that had not yet gone to trial should have raised red flags causing all members of SKG to question the payment. Members of a partnership cannot simply bury their heads in the sand and then claim lack of knowledge to obtain the benefit of the bargain. Therefore, I would find that arbitration is not proper in this matter because the partnership is charged with

30

constructive knowledge of the deal, based on the ignored $40,000 invoice that was paid without question.

**CARLSON, P.J., JOINS THIS OPINION IN PART.**