PIERCE, Justice,
for the Court:
¶ 1. The Hinds County Circuit Court imposed a joint and several monetary sanction for “intentional discovery violations” in the amount of $1,560,642.83 against Eaton Corporation, its Mississippi attorney, Michael S. Allred, and two Wisconsin attorneys for Eaton, Michael H. Schaalman and Gregory T. Everts. The circuit court also dismissed with prejudice all of Eaton’s claims against Frisby Aerospace and related parties, for “improper ex parte and fraudulent contacts” between attorney Ed Peters and then-presiding Hinds County Circuit Judge Bobby De-Laughter. Both Eaton and Allred appeal the monetary sanction (Schaalman filed an appeal but dismissed it voluntarily, and Everts did not appeal). Eaton also appeals the dismissal of its lawsuit against Frisby.
FACTS AND PROCEDURAL HISTORY
¶ 2. In July 2004, Eaton Corporation (Eaton), represented by Allred, filed suit in the Hinds County Circuit Court against Frisby Aeronautics and numerous individuals (Frisby), alleging that six engineers formerly employed by Eaton and subsequently hired by Frisby in 2001 had stolen proprietary information and trade secrets from Eaton. In September 2004, Frisby filed a countersuit against Eaton, alleging, inter alia, defamation. Frisby, suspecting that Milan Georgeff, a former Frisby employee, had been in contact with Eaton as a potential witness in the case, alleged in the countersuit that Eaton’s claims were *738 the result of an “inherently unreliable ... tale ... told by a disgruntled former employee, Milan Georgeff.”
¶ 8. The ease was assigned to then-Hinds County Circuit Judge DeLaughter. In December 2004, Michael H. Schaalman, Gregory T. Everts, W. Brian Gasscher, and Emily Feinstein of the law firm Quarles & Brady, based in Wisconsin, were admitted pro hac vice as counsel for Eaton.
¶4. Prior to the filing of Eaton’s suit against Frisby, Eaton reported the matter to the Federal Bureau of Investigation (FBI) and the U.S. Attorney’s Office, and a criminal investigation of Frisby ensued. In January 2004, the FBI raided Frisby’s offices and interviewed some of the defendant engineers in their homes. The FBI found some 16,000 pages of “technical data” that the defendant engineers had brought with them from Eaton. Criminal charges were filed against five of the engineers for violations of the Federal Economic Espionage Act, involving the same alleged theft that is at the core of Eaton’s civil action in this cause. In May 2012, the U.S. Attorney’s Office, under a newly appointed U.S. attorney, dismissed the indictments.
¶ 5. During discovery in the instant matter, Frisby propounded extensive interrogatories to which Eaton responded through Allred. On February 25, 2005, Eaton, per its attorney, Allred, served an answer to what has been labeled as “Interrogatory No. 3.” Interrogatory No. 3 reads as follows:
In paragraph 113 of your Complaint, you state that “(o)n about November 29, 2002, Plaintiffs first learned that the individual Defendants who were Eaton ex-employees, took with them to Frisby Aerospace all or a major portion of Eaton’s engineering CAD designs, drawings and specifications.” For this occurrence and for each additional occurrence on which you learned additional information, or confirmed previously learned information, relating to whether the individual Defendants took your engineering CAD designs, drawings and specifications with them to Frisby, please:
(1) state the facts describing how you learned this;
(2) identify the person that contributed in whole or in part to your learning this;
(3) state what you were told;
(4) identify any and all documents that you have, you were provided, or you developed, that relate to what you were told;
(5) state whether you have at any time since November 29, 2002, entered into any employment, consulting or other arrangement with any person identified in response to subpart (2) of this interrogatory; ...
(6) describe what steps you took to investigate the veracity of what you were told.
¶ 6. Eaton’s response to Interrogatory No. 3 identified an agreement and “communications” Eaton had with Georgeff. The response, in part, was as follows:
Answering further, Plaintiffs state that Plaintiffs have no employment, consulting or other agreement with Mr. Geor-geff, except to say that Plaintiffs have agreed in a written memorandum to extend a strictly limited indemnity to Mr. Georgeff to the limited extent that he may incur attorney’s fees and other actual costs in the event that defendants prosecute malicious litigation against him because of his status as a whistle-blower.
Except to identify this agreement for purposes of a privilege log, Plaintiffs do not waive but assert their ... common litigation and other privileges with re *739 spect to the written memorandum of agreement identified herein and any communications among counsel and principals with respect thereto.
¶ 7. On February 28, 2005, Frisby’s counsel, Robert Baron, via a telephone call to Schaalman, Eaton’s Wisconsin counsel, challenged Eaton’s assertion of privilege.[1] Baron then sent to Schaalman letters dated March 4, March 22, and May 2, 2005, each of which made written demands for the Georgeff indemnity agreement and threatened a motion to compel if the agreement was not produced.
¶ 8. On November 2, 2005, the Eaton-Georgeff agreement was produced to Fris-by in a wrongful-discharge lawsuit filed by Georgeff against Frisby in North Carolina. On January 4, 2006, Frisby filed a motion in the Mississippi case to dismiss and for sanctions against Eaton for unlawfully compensating a fact witness.
¶ 9. On January 17, 2006, Eaton filed a motion to refer the matter to a special master regarding Frisby’s motion to dismiss and for sanctions. Judge De-Laughter appointed Special Master Jack F. Dunbar to resolve the discovery disputes between Eaton and Frisby.
¶ 10. On March 23, 2006, Dunbar issued a report and recommendation (R & R) rejecting Eaton’s argument that the joint-defense privilege applied to protect the Georgeff agreement from disclosure.
¶ 11. On June 13, 2006, Dunbar issued an R & R regarding Eaton’s alleged discovery violations. Dunbar found that:
there existed [a] letter agreement dated January 28, 2003 between Eaton and [Georgeff] and his attorney, [James Marsala], which is described in its first paragraph to be a “consulting agreement.” After reciting a number of “factual premises” reflecting certain “misconduct” of Frisby by [Georgeff], which if true would support Eaton’s allegations, the [January 28, 2003] agreement, beginning on page 6, sets forth specific undertakings and agreements on the part of Eaton for the benefit of [Geor-geff] in return for his cooperation, which go far beyond a “limited indemnity agreement.”
Specifically, in summary, Eaton agreed, in return for the cooperation of Georgeff to:
1. Defend Georgeff from any liability, expenses, or damages he might incur in his cooperation with Eaton;
2. Pay for the defense of any litigation, civil or criminal, resulting from his cooperation;
3. Pay the legal fees of James Marsala, counsel for Mr. Georgeff in any such litigation.
4. Pay Mr. Georgeff s travel and related expenses, as a witness for Eaton, incurred in any litigation instituted by Eaton;
5. Provide employment to Georgeff should he lose employment under circumstances outlined in the Third para., page 7 of the attached consulting agreement.
6. Reimburse Georgeff for wages lost as a result of his cooperation in Eaton litigation at $50.00 an hour, for an 8 hour day and 40 hour week, as “estimated” lost wages. (See pp. 6-8 fo the attached consulting agreement.)
In addition, it is now known that Eaton also agreed to and did reimburse Mr. Georgeff for the attorneys’ fees he *740 incurred with his counsel, Mr. Marsala, in the development and drafting of the attached letter agreement of January 28, 2003. This reimbursement is not specified in the agreement itself, but apparently was the subject of a separate verbal agreement between Eaton and Mr. Georgeff, which should have been at least “identified” in Eaton’s Answer to the Engineer Defendants’ Interrogatory No 3, as an arrangement with Mr. Geor-geff.
(Emphasis original).
¶ 12. Dunbar found that, in response to Frisby’s discovery request(s), Eaton did not fairly or adequately identify the existence of the consulting agreement and other documents relating to the “arrangement” with Georgeff. The answer, according to Dunbar, was “inaccurate and misleading.” Dunbar said the failure to list the document on a privilege log was not a discovery violation because Frisby was “aware of Eaton’s privilege claims asserted in all its answers to all discovery.” Dunbar recommended that Frisby’s motion to dismiss be denied because its defense of the case had not been prejudiced. Dunbar also recommended that Eaton and outside Wisconsin counsel be sanctioned in an amount equivalent to Frisby’s expenses incurred in pursuing its motion to dismiss. Dunbar recommended further discovery to determine “who” (and with what “intent”) was involved in the discovery violations. On July 24, 2006, Judge DeLaughter adopted Dunbar’s R & R and directed the parties to abide by the terms and provisions thereof. Thereafter, Dunbar permitted and oversaw discovery, including depositions.
¶ 13. On December 5, 2006, Dunbar issued a supplemental R & R (December 2006 R & R), regarding the “Responsibility for Discovery Violations, Intent and Recommended Sanctions,” finding that Eaton’s discovery answers were “truly false” in an “intentional effort to mislead.” Dunbar recommended an award of monetary sanctions to make Frisby whole, which included reimbursing Frisby for all expenses, attorneys’ fees, and special-master fees, reasonably incurred by Frisby in the discovery-violation proceedings.
¶ 14. In the December 2006 R & R, Dunbar found that, although a “limited indemnity agreement” was not referenced in the privilege log later filed by Eaton on June 10, 2005, Eaton did give notice to Frisby in its response to the “Interrogatory No. 3,” that the “limited indemnity agreement” and “any communications” related thereto were subject to privileges. According to Dunbar, this answer suggested there might be (but did not acknowledge there were) communications relating to the “limited indemnity agreement.” The subsequent privilege log served on June 10, 2005, did not identify any Geor-geff-related communications. Following receipt of the of the Eaton discovery responses filed in February 2005, and telephone conferences with Eaton counsel, Frisby counsel pressed for the production of what they understood was a document reflecting a “joint defense privilege” with Georgeff and Eaton’s “indemnity” of him, as well as “communications” with Georgeff.
¶ 15. Dunbar found the exchange of letters between Eaton counsel and Frisby counsel instructive on the issues involved in this inquiry. On March 4, 2005, Baron wrote Schaalman, confirming a recent phone conversation with Schaalman:
You are taking the position that communications between you or Eaton’s in-house counsel and Milan Georgeffs counsel are subject to the joint defense privilege ... (as to) the actual written document memorializing this joint defense privilege and plaintiff’s indemnity of him. We oppose (the privilege claim) *741 and will seek a court order compelling its production if you do not ... produce it. We reserve the right to challenge other documents ... after reviewing your privilege log of all Georgejf-Eaton communications withheld on this ground.
(Emphasis in December 2006 R & R). According to Dunbar, Everts assumed the task of responding to these demands. On March 22, 2005, Baron wrote Everts to confirm their conversation of March 15, 2005, in which he made a further demand for “... the joint defense indemnity agreement ... between Eaton and Milan Geor-geff.” Dunbar found that these letters of March 4 and March 22, 2005, indicate that Baron was laboring under the impression that there was but one document that set forth both a joint defense agreement and the indemnity agreement. But there were two separate documents; i.e., a joint or common defense agreement between Eaton and Georgeff and his attorney Marsala, and a separate document we now know as the consulting agreement, called a “limited indemnity agreement” in Eaton’s responses to the defendant’s discovery. Eaton never clarified Baron’s misunderstanding.
¶ 16. Allred then became involved, writing Baron on March 30, 2005, and asserting a privilege as to Georgeff communications. Nevertheless he represented that Eaton “... will produce a privilege log relating to communications with Mr. Georgeff. This privilege log will be available shortly ....” Further, Allred advised, “We have disclosed the fact that Eaton has a joint defense agreement with Mr. Geor-geff ... we mil not produce the agreement (on ground of privilege)....” No reference was made to an “indemnity agreement” in this letter.
¶ 17. On May 2, 2005, Baron wrote Allred and reminded him of his promise to produce the privilege log, as to communications with Georgeff. Allred replied on June 2, 2005, confirming recent agreements with Baron via phone conferences. Allred agreed to produce the documents provided to the government in connection with its criminal investigation (including what is know as the “Georgeff Statement” relating Georgeff s claims of knowledge of the alleged “trade secret” misappropriations), and further, Allred acknowledged a promise:

Second, plaintiffs agreed to provide you with a copy of our communications with Milan Georgeff ... By June 13, 2005.

(Emphasis in December 2006 R & R). Everts, by letter of June 10, 2005, forwarded a “privilege log” identifying certain Bates-numbered documents. The log did not list or claim as privileged any Geor-geff-Allred/Eaton communications. And, as Dunbar found, there were many such communications.
¶ 18. On September 2, 2005, having received neither the Georgeff communications nor a privilege log designating Geor-geff communications as privileged, Baron wrote to Allred, Schaalman, and Everts with the following complaint:
... by letter dated March 30, 2005, Mr. Allred promised that a privilege log relating to communications with ■ Mr. Georgeff would be provided shortly. Five months have since passed and no such log has been provided. Nor are any documents relating to communications with Mr. Georgeff reflected on the privilege log provided to us. Such communications must be produced .... or that the very least place them on a privilege log if they exist, and are being withheld.
¶ 19. In response, on October 21, 2005, Everts responded to the Baron complaints:

Contrary to your assertion, Plaintiffs’ production to date has been full and complete based on the information and 
*742
documents in Plaintiffs’ possession, custody or control. Plaintiffs have provided defendants with a privilege log, and will update that log if needed.

And at page 8:

13e. Plaintiffs entered into an oral joint defense agreement with Mr. Geor-geff. Later this agreement was memorialized in writing (produced as EA 7kU2-⅛3) ... we will supplement our response and produce two additional documents that relate to this understanding.

And at page 9:

13f. We have made a good faith search for responsive document, and have produced the documents we have located. Please review our supplemental discovery response dated June 10, 2005 ... We are not trying to hide the ball, as you seem to believe, but have not found anything more.

¶ 20. Everts later testified that he intended for the consulting agreement to be one of the two additional documents he promised Baron in his letter of October 21, 2005. Eaton, however, never produced the consulting agreement nor the Georgeff-Allred/Eaton communications prior to the filing of Frisby’s motion to dismiss.
¶ 21. Prior to submitting the December 5 R & R, Dunbar had provided a draft of the R & R to the parties on November 20, 2006. Around this time, Allred recommended to Schaalman and Vic Leo, Vice President and Chief Inhouse Counsel for Eaton, that Eaton hire former Hinds County District Attorney Ed Peters. Judge DeLaughter had worked for Peters as an assistant district attorney for many years prior to becoming a circuit judge. In a December 1, 2006, email from Allred to Schaalman, Leo, and Sharon O’Flaherty, another inhouse counsel for Eaton, All-red wrote:
I confirm that I have now spoken to Edward J. Peters. He was for 30 years the district prosecuting attorney in Hinds County. He is the one person who is the closest possible associate of Judge DeLaughter. He is also [sic] well-respected prosecuting attorney. He is not someone who would do a lot of original legal research, but he can make a very powerful presentation in court if we do that work for him.
Peters then began assisting in the case, without filing an entry of appearance.
¶ 22. On January 5, 2007, in response to Dunbar’s December 5 R & R, Frisby filed a supplemented and renewed motion for dismissal and other sanctions based on payment of a fact witness and intentional discovery violations.
¶ 23. On February 2, 2007, Allred filed a notice of withdrawal as counsel for the Eaton plaintiffs. Judge DeLaughter entered an order on February 7, 2007, allowing Allred’s withdrawal. Schaalman and the other above-mentioned members of the Wisconsin law firm of Quarles & Brady remained as outside counsel for Eaton. Eaton also hired attorneys Fred Banks and Reuben Anderson — former Mississippi Supreme Court justices — to replace Allred.
¶ 24. On April 6, 2007, Judge De-Laughter entered a memorandum opinion. Judge DeLaughter found that the answer to Interrogatory No. 3 was inaccurate because it revealed that Eaton would indemnify Georgeff if he were sued, but it did not mention payment of other expenses or an offer of employment if Georgeff could not find another job. Judge DeLaughter further found that anyone who read the answer “knew that some kind of indemnity agreement existed” and noted that no defendant had moved to compel as required by Ford Motor Co. v. Tennin, 960 So.2d 379 (Miss.2007). Judge DeLaughter placed the responsibility for the discovery *743 violation primarily on Allred, stating as follows:
Moreover, the Court notes that Allred is no longer an attorney of record in this case, and has been replaced by Reuben V. Anderson, Esq., and Fred L. Banks, Jr., Esq., both former circuit judges and Supreme Court justices of this state. This Court has no doubt that the integrity of this Court will be maintained, and that false and misleading representations by Eaton’s counsel are matters of the past.
¶ 25. On April 16, 2007, Judge De-Laughter entered an order regarding the Georgeff agreement. In it, Judge De-Laughter denied Frisby’s motion to dismiss; ordered that Allred would be fined in an amount to be later determined; ordered that Eaton, Schaalman, and Allred would be assessed the costs that Frisby would have incurred in preparing a motion to compel, which Frisby subsequently estimated was approximately $24,400 to $48,800. Judge DeLaughter also ruled that, should Eaton call Georgeff as a witness at trial, the following jury instruction would be granted:
The [cjourt instructs the jury that the law views with great caution and skepticism the uncorroborated testimony of any fact or occurrence witness who has been paid or otherwise rewarded for their testimony or who testifies in hopes of any reward not authorized by law.
Therefore, if you believe the testimony of Milan Georgeff to be uncorroborated by other evidence, his testimony must be viewed by you with great caution and skepticism. This does not mean that you may not find in favor of the plaintiffs in this case based, in whole or in part, upon the testimony of Milan Georgeff. It does mean, however, that if not corroborated by other evidence, his testimony must be viewed with great caution and skepticism, and must not be improbable, self-contradictory, or substantially impeached before you would be authorized to find for the plaintiffs in this case.
¶26. In an order entered on October 29, 2007, Judge DeLaughter, finding that “discovery in this case is not being administered in a just manner,” removed Dunbar as special master and appointed Larry La-tham as his replacement.
¶ 27. In December 2007, Judge De-Laughter’s relationship with Peters became the subject of a federal investigation when evidence from the FBI’s investigation of Mississippi attorney Richard Scruggs suggested that Scruggs had used Peters in an unrelated case to influence Judge DeLaughter. Both Peters and De-Laughter were subpoenaed in the Scruggs investigation. In January 2008, Judge De-Laughter, sua sponte, recused himself from the Eaton/Frisby litigation, claiming that his assistance with the federal investigation into his relationship with Peters would impede the time he could devote to this case. That same month, the press reported that the federal investigation of Peters and Judge DeLaughter was being expanded to include an investigation of improper contacts between Peters and Judge DeLaughter in the Eaton/Frisby litigation. Judge DeLaughter thereafter was replaced by Judge Yerger.
¶28. On January 24, 2008, in light of Judge DeLaughter’s recusal, Frisby moved to stay proceedings pending review of the orders rendered by Judge De-Laughter. On January 28, 2008, Latham reported to the circuit court facts which indicated that Peters had been involved in improper ex parte communications with Judge DeLaughter about replacing Dunbar with him. Latham stated that he believed it inappropriate to serve under *744 those circumstances and was permitted to withdraw.
¶ 29. On January 29, 2008, Frisby filed a motion seeking to require that Eaton preserve the documents and evidence relating to the actions of Peters. Eaton subsequently agreed to such an order.
¶ 30. At a hearing on February 25, 2008, Eaton agreed with Frisby that the circuit court had the authority to and should review the rulings of Judge De-Laughter. On March 7, 2008, the circuit court entered an order staying discovery pending a review of Judge DeLaughter’s prior orders and asking the parties to agree on a successor special master. When the parties did not agree, Judge Yerger chose David Dogan (who had not been suggested by either party), as reflected in an order filed on April 15, 2008. On April 24, 2008, Eaton objected to the order appointing Dogan to the extent that the duties of the special master would be related to the inquiry into the ex parte communications of Peters, the review of the prior orders of Judge DeLaughter, or the attendance at any deposition. In addition, Eaton contended that the Frisby parties should be excluded from conducting discovery into the ex parte communications, suggesting instead that the trial judge should act as the principal investigator. Dogan conducted a hearing on those objections on April 28 and entered an R & R on May 1, 2008, recommending their denial, which Judge Yerger accepted in substance on May 15, 2008.
¶ 31. Dogan issued an R & R on May 19, 2008 (the Dogan May 2008 Report) finding that Judge DeLaughter had improperly rejected the factual findings of Dunbar related to Eaton’s discovery violations, and that sanctions should be imposed for those violations. On June 12, 2008, Judge Yerger, in a memorandum opinion and order, accepted the factual findings of Dogan and those of Dunbar which had been reviewed by Dogan, and accepted Dunbar’s recommendation that a sanction be imposed making Frisby whole for the entire cost of the expenses incurred related to the discovery violation inquiry. Judge Yerger stated in the order:
That Eaton, and its outside counsel, [are to] make whole financially all the defendants for all attorneys’ fees and expenses reasonably incurred in all matters involving discovery violations, beginning with the Motion to Dismiss, through and including the fees and expenses incurred in this Court to the date of their objections to the Dogan Report and Recommendation dated May 19, 2008. The reimbursement should not include the fees and expenses incurred by the defendants in preparing for and taking the deposition of Geor-geff, since that deposition would ultimately have been taken anyway at some point in this case.
¶ 32. On August 29, 2008, Dogan submitted an R & R as to the amount of fees and expenses that had been incurred by Frisby. Frisby had presented, by way of invoices, receipts, and affidavits, evidence it contended supported a cost award of $1,596,175.33. Eaton responded by calculating that it believed Frisby would be made whole financially by an award between $181,336.16 and $256,738.50. Relying on the McKee factors from McKee v. McKee, 418 So.2d 764 (Miss.1982), and the factors set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct, Do-gan’s August 2008 R & R recommended that “Eaton, i.e., Mike Allred, Michael Schaalman, Greg Everts, and Eaton Corporation pay [Frisby] the amount of $1,560,642.83 ($1,596,175.33, less $1032.50, less $27,500.00 and $7,000.00) .... ” After conducting a hearing on November 3, 2008, regarding that recommendation, Judge *745 Yerger directed on November 20, 2008, that Dogan provide additional findings. After further proceedings, Dogan entered an R & R on April 8, 2009, which recommended that Frisby would be made financially whole for fees and expenses incurred in the matters and time period as defined in the Judge Yerger’s June 12, 2008,' Opinion and Order “by payment from Eaton, 1.e., Mike Allred, Michael Schaalman, Greg Everts and Eaton Corporation, of $1,575,572.83 ([Frisb/s] submitted total of $1,596,175.38 less $20,602.50) ....” On January 6, 2010, Judge Yerger accepted both Dunbar’s and Dogan’s factual findings and concluded that there was clear and convincing evidence that Eaton, All-red, Everts, and Schaalman had perpetrated intentional discovery violations against Frisby. And Judge Yerger ordered that Eaton, Allred, Everts, and Schaalman, were jointly and severally liable to Frisby in the total amount of $1,560,642.83.
¶ 33. The inquiry into Peters and the ex parte communications with Judge De-Laughter proceeded with discovery and depositions taken in the presence of Do-gan, utilizing the same procedure that had been used with respect to Eaton’s discovery violations. Dogan issued an R & R on June 6, 2008, recommending that there was sufficient basis, under Hewes v. Langston, 853 So.2d 1237 (Miss.2003), to conduct an in camera inspection of documents for which Eaton claimed privilege. In an order dated July 14, 2008, Judge Yerger accepted the finding that there was sufficient basis for such an in camera review and made detailed rulings as to which documents were to be produced for review. After Eaton had submitted those documents for in camera review, Dogan, on November 4, 2008, submitted an R & R recommending that the crime-fraud exception be applied to certain of those documents.
¶34. Over Frisby’s objections, Eaton was permitted to submit in camera additional documents and to present testimony to Dogan at an in camera hearing from which Frisby was excluded. On February 9, 2009, Dogan provided a supplemental R & R recommending that the crime-fraud exception be applied to certain other documents. Judge Yerger conducted a hearing with respect to Eaton’s objections to that supplemental R & R on April 2, 2009. On June 19, 2009, Judge Yerger issued a detailed thirty-six-page opinion concluding that the crime-fraud exception applied to certain documents. In that opinion, Judge Yerger ruled that Eaton’s ex parte testimony presented to Dogan — the credibility of which Dogan already had rejected[2]— would not be considered. Following an unsuccessful interlocutory petition to this Court (2009-M-1125-SCT, Serial # 157738), Eaton produced the documents.
¶ 35. Subsequent discovery included the depositions of numerous witnesses, including several of Eaton’s lawyers, as well as Latham and others. DeLaughter and Peters, along with Mary Gaines, a former courtroom deputy who had worked with DeLaughter, were deposed but invoked the Fifth Amendment as to all substantive questions. As authorized by Judge Yer-ger’s April 15, 2008, Order, Dogan attended most of the depositions — just as Dunbar had attended the earlier depositions. Additional evidence was provided when the United States District Court for the Northern District of Mississippi released *746 the grand-jury testimony of Peters and related attached FBI interviews of Peters, which Judge Yerger ordered be made available to the parties for use in this case.
¶ 36. Following the conclusion of approximately eighteen months of discovery, Frisby filed on November 24, 2009, a renewed and supplemented motion to dismiss Eaton’s claims, along with a substantial volume of depositions and exhibits in support thereof. On the same day, Dogan issued an R & R as to the depositions he had attended. In response to the renewed and supplemented motion to dismiss and the R & R reporting on the deposition, Judge Yerger directed Dogan to issue a R & R regarding the renewed and supplemented motion to dismiss.
¶ 37. On December 23, 2009, Eaton filed a motion objecting to the Special Master having any role in considering the motion to dismiss, argued that this matter should be resolved by a jury trial, and asserted that Judge Yerger should recuse himself as trial judge. On December 29, 2009, Judge Yerger ruled that no trial was required as to the sanctions motion and restated his prior ruling with respect to the reference to the special master.
¶ 38. At a hearing on May 14, 2010, Judge Yerger heard argument on the numerous evidentiary objections asserted by Eaton in an R & R dated April 20, 2010. Judge Yerger ruled and reiterated his pri- or rulings on those objections by order dated June 9, 2010.
¶ 39. On August 11, 2010, Dogan issued a lengthy R & R (Dogan August 2010 R & R) recommending that Frisby’s motion to dismiss be granted. On September 10, 2010, Judge Yerger conducted a hearing on Eaton’s objections to that R & R. On December 22, 2010, Judge Yerger adopted much of the Dogan August 2010 R & R and, based on his own review of the evidence, granted Frisby’s motion to dismiss, and entering a final judgment and Rule 54(b) certification.
¶ 40. As reflected in the documents submitted to this Court in connection with the motion to stay appeal (filed May 10, 2012) and the motion to revoke Rule 54(b) certificate (filed September 27, 2010), Fris-by contends it is now clear that Eaton improperly withheld highly relevant documents from Judge Yerger that further supported Judge Yerger’s factual findings and added more detail about the knowledge of Eaton’s inhouse counsel (including Eaton’s general counsel) as to the ex parte communications of Peters with DeLaughter. In April 2012, Eaton had produced two previously concealed emails which show that several Eaton lawyers (including its general counsel) received notice of the ex parte communications of Peters with former Judge DeLaughter.
¶ 41. Judge Weill, who replaced Judge Yerger after his retirement, required explanatory affidavits from Eaton’s lawyers and its CEO for the belated production of these documents. According to Frisby, the resulting affidavits made clear that the failure to produce the new documents could have resulted only from intentional misconduct, that Eaton purposefully allowed the destruction of documents that Eaton had been ordered to preserve, and that Eaton’s lawyer had provided false affidavits to Judge Yerger. Judge Weill then ordered Eaton to produce additional documents for in camera review. After review, Judge Weill directed by order dated September 19, 2012, that a substantial number of additional documents be produced to Frisby.
¶ 42. Eaton requests this Court to take judicial notice of the new documents. Frisby agrees with Eaton’s request and also requests that this Court take judicial notice of other additional documents that *747 further support the factual findings of Judge Yerger. Frisby maintains, however, that none of these documents is necessary for affirmance of the trial court’s dismissal.
¶ 43. Frisby further points out that this Court denied two motions filed by Frisby intended to allow this additional information to be reviewed by Judge Weill for the purpose of making additional findings. Frisby asks that, should there be any concern as to whether Judge Yerger’s rulings should be affirmed, this Court reconsider those motions so that this Court may consider all of the evidence, including the additional evidence improperly concealed by Eaton.
¶ 44. We decline to take these additional documents into consideration for purposes of this appeal. And we now proceed to address the issues presented. Additional facts from the record designated under Judge Yerger’s Rule 54(b) certification will be related in the discussion of the issues.[3]
DISCUSSION
I. Whether the circuit court erred in imposing $1.56 million in monetary sanctions against Allred and Eaton for discovery violations.
¶ 45. “Trial courts have considerable discretion in discovery matters and decisions will not be overturned unless there is an abuse of discretion.” Scoggins v. Ellzey Beverages, Inc., 743 So.2d 990, 996 (Miss.1999) (quoting Robert v. Colson, 729 So.2d 1243, 1245 (Miss.1999)). In reviewing a decision that is within the trial court’s discretion, we first ask if the trial court applied the correct legal standard. Burkett v. Burkett, 537 So.2d 443, 446 (Miss.1989). We will affirm the trial court’s decision “unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors.” Id. (quoting Cooper v. State Farm Fire & Cas. Co., 568 So.2d 687, 693 (Miss.1990)). In matters where a special master is appointed, the trial court shall accept the special master’s factual findings unless manifestly wrong. Miss. R. Civ. P. 53. Thus, we do also.
¶46. Both Allred and Eaton contend that we should look at the discovery sanction de novo because the circuit court applied the wrong law. Eaton argues that the correct legal test, which the circuit court did not apply, is whether Eaton was “grossly indifferent to its discovery obligations,” not whether it was responsible for some undefined “willful neglect.” Eaton maintains that no one should have been sanctioned for an incorrect and incomplete description in an interrogatory answer where it asserted a privilege, it identified the agreement, and the description given was adequate to alert the opposing party to a need to file a motion to compel. Eaton also submits that Eaton itself should not have been sanctioned when it put the facts in outside counsel’s hands and trusted counsel to decide the necessity and manner of disclosure.
¶ 47. Allred argues that nothing in the consulting agreement or any action taken under it is sanctionable under Mississippi Rule of Civil Procedure 37(b)(2), since protecting a whistleblower witness from loss for having the gumption to speak up is not improper. Allred contends that no judge or special master ever concluded that Eaton had agreed to pay Georgeff to provide favorable testimony. And Frisby’s efforts *748 to show “unlawful inducements” and an “improper relationship” yielded no discovery violation, and are not “relevant to the issues raised by the claims or defenses of any party.” Miss. R. Civ. P. 26(b). Allred maintains that Frisby knew enough on the next business day that it informally demanded production of the “written memorandum to extend a strictly limited indemnity” to Georgeff. Allred further contends that Frisby sandbagged Eaton, and that it told Eaton and Allred that if Eaton did not abandon its privilege defense with respect to Georgeff-related discovery, Frisby would move to compel discovery. Then, instead of filing a motion to compel, Frisby filed a motion to dismiss and for sanctions. Allred submits that Rules 87(a)(2) and (3), coupled with Rule 87(b)(2), compel reversal.
¶ 48. Both Eaton and Allred further argue that Eaton had asserted a privilege, the common litigation privilege, which no judge had yet rejected. Both maintain that disclosing the content of the consulting agreement would have waived that privilege.
¶ 49. At the outset, we find that the correct legal standard was applied in this matter. This Court has long held that our trial courts have the “discretion to impose sanctions for discovery violations which result from willful neglect, willful disobedience or cause undue advantage and surprise.” State v. Blenden, 748 So.2d 77, 83 (Miss.1999) (citing Ladner v. Ladner, 436 So.2d 1366, 1370-71 (Miss.1983)). We see no distinction whatever between a trial court’s finding of “gross indifference” or “willful negligence” to a discovery requirement. Both are “willful” violations and an abuse of the truth-seeking process. As this Court has explained:
A willful violation of a discovery rule occurs when there is a conscious or intentional failure to comply with the rule’s requirements. A finding of willfulness may be based upon either a willful, intentional, and bad faith attempt to conceal evidence or a gross indifference to discovery obligations.
Pierce v. Heritage Props., 688 So.2d 1385, 1388 (Miss.1997) (citing Medina v. Foundation Reserve Ins. Co., 117 N.M. 163, 870 P.2d 125, 126 (1994)). Therefore, we are left to decide only whether the record reflects that the trial court’s monetary sanction against Allred and Eaton for discovery violations was an abuse of discretion.
¶ 50. As mentioned, in response to “Interrogatory No. 3,” which required Eaton to identify any employment, consulting or other arrangement with the person who had provided the information upon which Eaton had predicated its complaint, Eaton proffered the following response in February 2005:
Answering further, [Eaton] states that [Eaton] [has] no employment, consulting or other agreement with Mr. Georgeff, except to say that [Eaton has] agreed in a written memorandum to extend a strictly limited indemnity agreement to Mr. Georgeff to the limited extent that he may incur attorneys’ fees and other actual costs in the event that [Frisby] prosecute[s] malicious litigation against him because of his status as a whistle-blower.
¶51. As Dunbar found, Dogan confirmed, and Judge Yerger concluded, this answer was false. Eaton had agreed to provide more than a “strictly limited indemnity agreement” to Georgeff. Eaton also had a “consulting agreement” with Georgeff under which Eaton had been paying Georgeff, and Eaton also had an agreement to provide employment to Georgeff until at least age 65.
¶ 52. Eaton was required to disclose this information to Frisby when Fris- *749 by propounded an interrogatory inquiring if such an arrangement existed. “Parties, like witnesses, are required to state the truth, the whole truth and nothing but the truth in answering written interrogatories.” Pierce, 688 So.2d at 1389 (quoting Hunter v. Int’l Sys. and Controls Corp., 56 F.R.D. 617, 631 (W.D.Mo.1972)). “A false answer is in some ways worse than no answer [because] it misleads and confuses the party.” Id. (citing Smith v. Cessna Aircraft Co., 124 F.R.D. 103, 107 (D.Md. 1989)).
¶ 53. As discussed in the December 2006 R & R, Allred had submitted an affidavit to Dunbar which attempted to explain the interrogatory answer as mere inadvertence that had occurred in a late night drafting session. Dunbar rejected that explanation, finding that Allred’s explanation for his error as “inadvertence” was not credible and that the answer was “truly false.” Dunbar concluded that the interrogatory answer was prepared by All-red with “an intent to be inaccurate and misleading and that Allred [had] perhaps done so in the hope that Frisby would not be inclined to spend the effort to pursue the issue, because the agreement as described by Allred would only become effective if Georgeff were sued by Frisby.” We find that the record evidence fully supports this conclusion.
¶ 54. Next, we reject Eaton’s contention that it should not be held responsible for facts that were in outside counsel’s hands and for trusting counsel to decide the necessity and manner of disclosure. To say that Eaton was a hapless client in this instance goes beyond the realm of logic and credulity. According to the record, the consulting agreement was executed on January 28, 2003, with the knowledge and approval of Leo and a number of other Eaton in-house lawyers. As Dunbar found, Eaton had made payments to Geor-geff in the amount of $6,000, for “time” involved, and payments to Georgeff s attorney, Marsala, for $21,000 in attorneys’ fees — even though Georgeff had not been sued by Frisby. According to the record, Eaton inhouse counsel Sharon O’Flaherty approved these payments. And the record is replete with revelations that these same individuals knew (or most certainly should have known) about “Interrogatory No. 3,” and Allred’s February 2005 response to it, long before Frisby obtained a copy of the consulting agreement in November 2005 by way of a document production by Geor-geff in his litigation against Frisby in North Carolina.
¶ 55. As to the contention made with regard to the so-called “common litigation privilege,” it too is without merit. A party may invoke a privilege in an answer to an interrogatory or document request. Whether the particular privilege is applicable, though, is ultimately for the trial court to determine, not the party or counsel. Mississippi Bar v. Mathis, 620 So.2d 1213, 1221 (Miss.1993). The proper procedure for invoking a privilege is for the party to object to the interrogatory or document request and affirmatively assert the privilege and “identify those documents and portions of documents for which it, in good faith, claims are privileged.” Powell v. McLain, 105 So.3d 308, 312 (Miss.2012) (citing Roman Catholic Diocese of Jackson v. Morrison, 905 So.2d 1213, 1248 (Miss.2005)). Here, Eaton asserted a privilege; but it failed to identify any of the “privileged” documents. As Dunbar found,
While Allred may have believed that the Georgeff-Allred/Eaton communications were privileged, he knew those documents existed, and should have identified at least in [the interrogatory] response or later in Eaton’s privilege log, if not produced voluntarily. The prob *750 lem with identifying the communications, of course, was that their content, if produced, would have led to the discovery of the consulting agreement.
(Emphasis added.) Again, the record clearly supports this finding. And more significantly, Eaton had asserted the privilege in conjunction with a false and misleading response. We spoke to a similar finding in Mississippi Bar v. Land, 653 So.2d 899, 909 (Miss.1994), where we stated:
Land believed the information which Rachel Cole had obtained, including interviews and photographs concerning the BB gun, was privileged as work product material and involving matters subject to the attorney/client privilege. Land’s action in responding to the interrogatories, clearly withholding relevant material information, and giving misleading, deceptive and outright false responses without seeking the same protective order of the court, effectively eliminated any credibility for Land to maintain that position.
¶ 56. Likewise, we find without merit, the arguments that Eaton and Allred should not have been sanctioned because Frisby did not file a motion to compel without merit. As noted in Dunbar’s December 2006 R & R and Dogan’s May 2008 R & R, this Court has said that the preferred procedure is to move to compel once aware of an incomplete or evasive discovery response. Tennin, 960 So.2d 379; Warren v. Sandoz Pharms. Corp., 783 So.2d 735 (Miss.Ct.App.2000); Caracci, 699 So.2d at 546. Indeed, as this Court reiterated in Tennin:
Under our rules of civil procedure, failure to make or cooperate in discovery should first be resolved by making a motion in the proper court requesting an order compelling such discovery. See M.R.C.P. 37(a)(2). The remedy for failing to comply with the discovery requests when the trial court grants an order to compel falls under M.R.C.P. 37(a)(4) in the form of awarding the moving party the expenses for such a motion. See M.R.C.P. 37; January v. Barnes, 621 So.2d 915, 922 (Miss.1992). After such an order to compel has been granted under M.R.C.P. 37(a)(2), and the party ordered to answer fails to respond, then the remedy may be sanctions in accordance with M.R.C.P. 37(b).
Tennin, 960 So.2d at 393 (quoting Caracci, 699 So.2d at 557) (emphasis original). But, as Pierce instructs, this Court also remains steadfastly cognizant that our trial courts must have the authority to issue appropriate sanctions to what the discovery transgression warrants. See also M.R.C.P. 37(e) (providing that “the court may impose upon any party or counsel such sanctions as may be just, including the payment of reasonable expenses and attorneys’ fees, if any party or counsel ... abuses the discovery process in seeking, making or resisting discovery”).
¶ 57. In Pierce, this Court affirmed the trial court’s dismissal of an action as a sanction imposed under Rule 37(b)(2) & (e) after determining that the plaintiff had willfully concealed the fact that another person was present when she was injured. Id. at 1387. Pierce is distinguishable from the case before us in that Rule 37(a), governing motions to compel discovery, was not at issue. But, in discussing discovery violations in general, Pierce cited and quoted with approval Orkin Exterminating Co. v. McIntosh, 215 Ga.App. 587, 452 S.E.2d 159 (1994). Pierce, 688 So.2d at 1390. Orkin had been sanctioned for providing a false interrogatory answer that denied the existence of documents that later came to light. Orkin, 452 S.E.2d at 161. There was no order to compel. Id. at 163. The Georgia Court of Appeals *751 rejected Orkin’s argument on appeal that there had been no prior order, observing that the false answer and assurances had “forestalled a motion to compel or order compelling discovery” and affirmed the sanctions award, stating:
We conclude the trial court had the power under OCGA § 9-ll-37(a)(4)(A) to award the attorney fees incurred by plaintiffs as a result of Orkin’s erroneous denial of the existence of relevant documents, as though awarding attorney fees in connection with a successful motion to compel. This fulfills the trial court’s stated purpose not to impose sanctions but to recompense plaintiffs for the expenses they incurred as a result of Orkin’s conduct. We note that Orkin’s conduct not only necessitated substantial expense to plaintiffs; it caused a mistrial and the waste of substantial time, money, and judicial resources.
Orkin, 452 S.E.2d at 163-64. Quoting from Orkin, the Pierce Court stated as follows:
The rule is similar in Georgia. When a party has frustrated the orderly judicial process by false or erroneous responses to interrogatories, that party should not be able to argue that its own conduct has removed it beyond the reach of sanctions. The Georgia Court of Appeals has enunciated its policy behind precluding such actions by a party:
To condone such conduct would force parties to assume the falsity of every sworn interrogatory response and file endless motions preserving their right to relief. Such a rule would allow the unscrupulous to conceal documents from opposing parties by the simple expedient of denying their existence, without fear of penalty if the deception were by some chance discovered. It would discourage diligence in seeking out relevant documents even on the part of those not actively dishonest. Lack of diligence or negligence would not only be unpunished, it would be rewarded.
Pierce, 688 So.2d at 1391.
¶ 58. Here, as Dunbar found, Eaton took affirmative actions to conceal the consulting agreement, and Eaton’s continuing evasive representations and failures of Eaton’s counsel to produce the promised communications to Frisby were evidence of an intent to mislead and “hide the ball.” Even after Eaton lawyer Feinstein made it clear in emails to the other Eaton lawyers the consulting agreement and related documents had not been identified or produced, Eaton’s lawyers took no corrective action.[4] As Dunbar concluded:
If these failures of document production and/or identification had been the result of inadvertence or oversight, upon receipt of this receipt from Feinstein we would expect Allred, Schaalman, Everts and O’Flaherty to immediately drop everything, contact the defendants, acknowledge the oversight, and apologize with assurances of an immediate supplemental response to the flawed discovery responses. But they did nothing.
¶ 59. When the consulting agreement was disclosed in the North Carolina litigation, Eaton’s discovery malfeasance was exposed. And the matter then developed into an onion-like inquiry (at the behest of Eaton) that ultimately revealed layers of *752 discovery transgressions on the part of Eaton — causing substantial expenses and wasted time for Frisby with regard to discovery information critical to Frisby’s case — information to which Frisby was entitled all along.
¶ 60. Accordingly, we find no abuse of discretion in the trial court’s decision to impose the monetary sanction issued in this instance, despite the absence of a motion to compel. As the proceedings that ensued following Frisby’s January 2006 motion to dismiss illustrate, a motion to compel would have been futile for Frisby based upon Eaton’s tactics in this matter.
¶ 61. This issue is without merit.
II. Whether the circuit court erred in dismissing Eaton’s claims against Frisby based on improper ex parte communications between Ed Peters and Judge Bobby De-Laughter.
¶ 62. When the trial court imposes the sanction of dismissing any part of an action, this Court reviews that dismissal under an abuse-of-discretion standard. Pierce, 688 So.2d at 1388. We will affirm the trial court’s decision to dismiss unless there is a “definite and firm conviction that the court below committed a clear error of judgment in the conclusion that it reached upon weighing of relevant factors.” City of Jackson v. Rhaly, 95 So.3d 602, 607 (Miss.2012) (emphasis original).
¶ 63. The circuit court dismissed Eaton’s claims against Frisby based on a finding of clear and convincing evidence that:
Eaton and its counsel were aware of and, in fact, sanctioned Peters’ clandestine actions, either through affirmation or inaction, with then-Judge DeLaughter, for Eaton’s benefit; Eaton and its counsel were not “blameless”;
[R]ed flags [were] flying throughout Peters’ surreptitious and improper involvement in this case;
Eaton and its counsel were aware of and, in fact, sanctioned Peters’ clandestine actions, either through affirmation or inaction, with then-Judge DeLaughter, for Eaton’s benefit;
Eaton, through its counsel, basically “turned Peters loose,” without an appearance by Peters in the case, to “play a fast and loose” role, initiating ex parte contacts to the benefit of Eaton and to the detriment of [Frisby];
Eaton and its counsel are also in clear violation of [URCCC]. 1.10, which states, in relevant part, “no person shall ... attempt in any manner ... to influence the decision of the judge in any such case or matter”;
The gross impropriety involving Ed Peters, the Plaintiffs, and then-Judge De-Laughter cannot be disregarded or condoned by this [c]ourt; and
Eaton and its counsel knew of the serious improprieties occurring, on its behalf, between Peters and DeLaughter, and stood by “with blind eyes.”
¶ 64. Eaton argues that the standard of review is de novo because the trial court did not follow applicable law when exercising its discretion and dismissing Eaton’s case for “fraud on the court.” Eaton contends that the procedure invented by Do-gan and the trial court trampled on Eaton’s rights in many ways. Among other things, Eaton never got an evidentiary hearing and was hamstrung by privilege rulings which kept it from presenting a substantial part of its evidence. In addition, the trial court abused its discretion by making numerous errors of law. According to Eaton’s brief:
*753 The trial court failed to apply the “any hypothetical reasonable juror” standard for clear and convincing evidence;
The trial court committed manifest error in disregarding the undisputed evidence that Ed Peters did legitimate legal work and [that] Frisby knew Peters had been retained by Eaton and had not entered an appearance;
The trial court ignored the legal standards applicable to ex parte contacts; The trial court held against Eaton inadmissible evidence of actions by Peters about which Eaton had no knowledge and that were not in the “ordinary course” of representation.
Eaton further contends that, even if this Court were to accept the circuit court’s findings that Eaton’s inhouse counsel knew that Peters had talked directly to Judge DeLaughter ex parte, that fact is not dis-positive. This is because any contact with the court that the evidence shows Eaton knew about is not so clearly and convincingly a contact about the merits of the case designed to influence the judge as to merit the imposition of the sanction of dismissal.
¶ 65. As with the first issue, we do not need to review de novo the trial court’s decision to dismiss, because we find that the trial court applied the correct legal standard. Again, we are left to decide only whether the record reflects that the trial court’s dismissal of Eaton’s claims against Frisby reflects an abuse of discretion.
¶ 66. In Judge Yerger’s December 2010 ruling, Judge Yerger found that Dogan’s August 11, 2010, R & R made very comprehensive findings of fact regarding the events — which Judge Yerger found provided clear and convincing evidence of improper contacts between Peters and Judge DeLaughter. Dogan made additional detailed findings of fact regarding clear evidence that Eaton knew or should have known of these improper contacts on its behalf. Judge Yerger adopted those findings and discussed a few examples and “red flags” of direct or implicit knowledge on the part of Eaton, as follows:
a) Peters’ Failure to Enter an Appearance[:] It is undisputed that Peters was hired as DeLaughter’s “closest possible associtate [sic]” Allred, former counsel for Eaton, made that clear to Leo and Schaalman, corporate officer and inhouse counsel and outside counsel for Eaton, respectively. Exhibit 5047. Leo and Schaalman clearly understood the possible recusal implications that stemmed from Peters’ involvement. Exhibit 5078; Schaalman Depo. at 254-259; Leo Depo. at 75-77. Accordingly, Eaton and its counsel kept Peters’ involvement a secret, despite the fact of Eaton’s knowledge that Peters, who had never made an appearance in the case, was having conversations with [c]ourt involving various matters. Exhibits 5051; 5116; 5078. The importance that Eaton placed on the secrecy of Peters’ involvement was further made clear through an e-mail sent by Mary Persch, secretary to Michael Schaalman, outside counsel for Eaton. The e-mail was sent by Persch to other secretaries involved in the subject case. Persch made clear that “we shouldn’t list Ed Peters’ name on anything, even as a bbcc. His name shouldn’t appear and we will send him, everything separately from all parties, even the bee’s ...” Exhibit 5086. A follow-up e-mail from Persch provided more clarification, stating “[t]he concern really is just that perhaps a mishap will happen and these bcc and bbcc listings could accidently be sent and at this point, Michael Schaalman doesn’t want the other side to see his name. Id. (emphasis added). [Dogan] found that, when deposed, Mary Persch had no spe *754 cific recollection of Schaalman giving her the instruction to circulate the e-mail or the reasoning as to why the e-mail was to be circulated.” See November 24, 2009 R & R, p. 6. Schaalman gave a paltry explanation that Peters was “technologically challenged;” therefore] Schaalman instructed that Peters’ name be left off correspondence, so Peters would not accidently divulge privilege information. Schaalman Depo. at 67-69. The [e]ourt finds, by clear and convincing evidence, that Eaton and its counsel intentionally hid Peters’ involvement from [Frisby], despite knowledge that Peters was communicating with the Court regarding various matters, in hopes of avoiding a “Motion to Disqualify (Ed Peters — when he enters an appearance — and the Judge).”
b) Peters’ Known Contacts with the Court[:] On January 16, 2007 Peters’ time records reflect his contacts with Schaalman and the Court regarding a contested order that DeLaughter issued that same day. Exhibits 5051; 5116. Peters’ time records also indicate communications with the Court Administrator regarding trial settings, which was a disputed issue. Id. Peters admitted that his “presence in the court was influence (sic) for his client[,]” regarding the subject case. Exhibit 5078 at Davidson 88. Peters’ statements to the federal grand jury and federal investigators in the Northern District of Mississippi contain Peters’ admissions that he had ex parte contact with DeLaughter.
c) Eaton’s Attempt to Explain Peters’s Contact with the [Trial] Court[:] The most direct documents which evidence Eaton’s and its counsel and/or corporate officers’ knowledge of Peters’ improper contact on its behalf are found in Exhibits 5052 and 5061. Exhibit 5052 is an e-mail from Vic Leo, Vice-President and Chief Counsel for Eaton, to Mark McGuire (General Counsel for Eaton), Taras Szmagala (Vice-President and Chief Counsel for Eaton), Sharon O’Flaherty (internal Eaton counsel) and Theresa Thomas (internal Eaton employee). In the e-mail, Vic Leo states that Peters “intends to speak with the Court Administrator and the Judge about the trial date. This may take some finessing.” Exhibit 5052. The email goes on to state that when Leo asked Peters “what the chances were that the Judge would simply withhold ruling on the amount of any monetary sanctions against Allred and Eaton until later in the case, possibly after the trial[, something that was very important to Eaton,] Ed said he believed that there was ‘a 100% chance that would happen; maybe I am off a percent or two.’” Exhibit 5052. When offered a chance to explain this language at his deposition, Leo stated that this conversation with Peters “gave no indication” of any ex parte contact with then-Judge De-Laughter. Leo Depo. at 281-82. In Exhibit 5061, Vic Leo sent an e-mail to Mark McGuire and Sharon O’Flaherty regarding the possible recusal of a judge in the federal criminal case. Leo stated that “Judge DeLaughter felt uncomfortable about the contact from Judge Lee and certainly Ed Peters has taken his [DeLaughter'sj temperature on this meeting and he is recommending that we go forward with it.” Exhibit 5061 (emphasis added). When given a chance to explain this language, Leo stated that “[t]his is not accurately written.” Leo Depo. at 199. Leo further stated that “what was intended to be conveyed here was that Ed Peters’ temperature was taken.” Id. at 200. Leo gave a different explanation at a December 4, 2008 hearing before Special Master Dogan. (See Transcript of December 4, 2008 *755 hearing, p. 144-45, wherein Leo explained that “taken his temperature” were his words, and used that phrase in order to “convey to Mark [McGuire, Executive Vice President] ... that we needed to do this [talk with DeLaughter about the federal case], and the group felt we needed to do this.” Further, Leo testified that Schaalman reported to him that “Ed says we’re fine on that. He doesn’t see an issue there.”). In Leo’s December 4, 2008 testimony, there was never a reference to “taking Ed Peters’ temperature.”
Judge Yerger found that the above facts and findings, coupled with reasonable inferences, serve as direct evidence and/or strong circumstantial evidence of Eaton’s knowledge (through Eaton’s corporate officers and Wisconsin counsel) of Peters’s improper contacts with Judge DeLaughter.
¶ 67. In reviewing Dogan’s August 11, 2010, R & R, we find that Dogan set forth a number of events and rulings by Judge DeLaughter in the case which Dogan found were evidence of improper influence of Peters upon DeLaughter. As mentioned, Judge DeLaughter rejected most of Dunbar’s findings in the December 2006 R & R, reporting Eaton’s intentional discovery violations. Dogan found that Judge DeLaughter’s rejection of Dunbar’s fact findings is explained by Peters’s confession to the FBI. In his FBI statement, Peters said that he read Dunbar’s December 2006 R & R during a meeting at Allred’s office. Peters then later had lunch with DeLaughter and told him that he and attorney Reuben Anderson were representing Eaton. Peters told De-Laughter that the December 2006 R & R was very hurtful to Eaton. Peters asked DeLaughter to read the report for its content and to be cognizant of the “smoke and mirrors” that he believed were contained in the report. Peters reported to the FBI that “DeLaughter did eventually change the Special Master’s report to a position that was helpful to Eaton.”
¶ 68. According to Dogan, the June 7, 2007, scheduling order effectively rejected Frisby’s motion that Eaton identify its trade secrets in time to allow Frisby to conduct discovery on those issues prior to completion of the discovery deadlines established by the scheduling order. Peters’s involvement in the order is shown by an improper ex parte communication from Peters to “Mary Gaines — for the judge.” The evidence reflects that Gaines concealed Peters’s improper communications with DeLaughter. Gaines sent Peters a separate copy of the scheduling order within minutes after she asked counsel for Frisby to distribute copies to all parties.
¶ 69. Dogan noted that Judge De-Laughter’s removal of Dunbar occurred in October 2007 following two Dunbar R & R’s in 2007 that were favorable to Frisby regarding discovery matters. Dunbar had found that Eaton and its counsel had committed multiple intentional discovery violations. Next, on October 10, 2007, Dunbar recommended sanctions for Eaton’s failure to provide discovery with respect to trade secrets based upon prior orders by Judge DeLaughter requiring that Eaton provide such discovery. Judge DeLaughter, however, subsequently refused to follow this recommendation, despite his earlier order to the contrary on this issue. Then on October 23, 2007, Dunbar recommended that Eaton be required to provide testimony at a Rule 30(b)(6) deposition on matters critical to the case. See Miss. R. Civ. P. 30(b)(6). In less than a week following the R & R, Judge DeLaughter removed Dunbar as special master and replaced him with Latham.
¶ 70. Peters admitted to the FBI that he had ex parte communications with De- *756 Laughter related to the replacement of Dunbar with Latham. Peters contacted Latham about serving as special master on October 25, two days after the October 23 R & R. Phone records produced by De-Laughter show several phone calls between Peters and DeLaughter on and before October 25, the day on which Latham testified that he had been contacted by Peters about service as special master. DeLaughter invoked the Fifth Amendment as to those telephone calls.
¶ 71. Latham’s testimony reveals that he was contacted by Peters about service as the special master at a time when Fris-by did not know that Judge DeLaughter intended to replace Dunbar. DeLaughter knew that Peters had contacted Latham, as shown by his letter delivered to Latham on October 29. That letter noted that Latham had preliminarily agreed to serve as special master, a fact which Latham testified he had made known only to Peters. Peters understood these communications to be improper, since Peters left word that Latham was not to mention Peters’s name in connection with this matter.
¶ 72. Also in Dogan’s August 11, 2010 R & R, Dogan found that the following evidence reflected that Eaton knew or should have known about the misconduct of Peters in his ex parte communications with Judge DeLaughter on Eaton’s behalf, which we relate, in part, verbatim from Dogan’s August 2010 R & R:
(a) Leo and Schaalman understood that Peters and DeLaughter had a very close relationship. First they had Allred’s “closest possible associate” email. In addition, Allred testified that he “very well might have” told Schaalman about DeLaughter’s apparent tendency to be influenced by a friend like Ed Peters.
(b) Peters informed Eaton’s lawyers that he intended to play only a covert role in the case. Schaalman testified that at a meeting on January 15, 2007, which was attended by Leo, Eaton agreed with Peters’ suggestion that he should not argue before DeLaughter because of press publicity which criticized the close relationship between Peters and DeLaughter related to another case. Leo fully understood the close relationship between Peters and DeLaughter as further evidence by the fact that Leo expected [Frisby] to file a motion to recuse if Peters entered his appearance. Peters also told the FBI that he did not enter an appearance so that DeLaughter would not recuse himself.
(c)Leo testified that Peters was originally hired on an hourly basis to work on briefs. Leo told Peters the case was large in potential damages value, and was certainly worth an amount in the tens of millions. During a private lunch meeting approximately two weeks after the January 15, 2007 meeting of Peters with Leo and Schaalman, Leo and Peters agreed to a 1% contingency fee that might go up but not down. Peters also made clear at that meeting that he did not want to keep time records. Peters later told the FBI that he believed the case was worth two hundred million dollars. Thus, according to Dogan, Eaton hired Peters to work on matters pending before DeLaughter on a contingent fee of at least 1% of two hundred million dollars, and allowed Peters to work on Eaton’s behalf without entry of appearance. The failure of Peters to enter an appearance suggests that Eaton expected Peters to justify payment of a very large fee through actions, such as ex parte communications, that did not require Peters to make an appearance. The contingent fee agreement was never reduced to writing during the next elev *757 en months while Peters was involved in the case.
(d) Leo’s March 28, 2007 emails to Schaalman and O’Flaherty reveal that Eaton was waiting to agree on the level of the contingent fee to see if Peters could produce results. Eaton’s position that the contingent fee was based on the expectation that Peters would play a major role in the case in the future is inconsistent with the fact that Peters did not enter an appearance, nor participate in the numerous important deposition and motion disputes that took place over the next year.
[[Image here]]
(e) Time records for January 26, 2007, reveal that Peters had conversations with the Court Administrator about trial settings. It is unlikely that Peters was attempting to reserve trial settings without approval from Leo and Schaalman.
(f) An Eaton Answer to Interrogatory states that Peters, Anderson, Banks, and Schaalman recommended to Leo that Allred be asked to withdraw as local counsel for Eaton following the finding of intentional discovery violations. Peters told the FBI that he had recommended that Eaton dismiss Allred because of his involvement in the discovery violations. Peters also recommended hiring attorneys from Phelps Dunbar as local counsel. This allowed DeLaughter to place the bulk of the responsibility for the discovery violations on Allred[J
(g) By April 7, 2007, Leo had personal knowledge that Peters had secured or reserved a trial date for November or December of 2007. This indicates that Leo must have known about contacts by Peters with the Court prior to that date.
(h) On April 7, 2007, Peters advised Leo that he intended to contact Judge De-Laughter and the court administrator about the trial date. Rather than make inquiry about the ex parte nature of the communications, Leo encouraged Peters to have such communications. Leo’s email of April 7, 2007 reflects that the anticipated imposition of sanctions was a second question that Leo posed to Peters. In response to Leo’s inquiry as to whether DeLaughter would postpone the imposition of sanctions, Peters reported to Leo that there was a “100% chance that would happen; maybe I am off a percent or two.” Since there was nothing by court opinion and order to suggest that there would be such a delay, Leo must have known that the source of Peters’ information was an ex parte communication with Judge De-Laughter. Leo was thereby placed on notice that improper conduct may have occurred and chose not to inquire further about it.
Peters told the FBI that he advised DeLaughter “not to take any hasty action” in imposing sanctions with respect to this case. No sanctions were imposed by DeLaughter during the next nine months prior to DeLaughter’s decision to recuse himself in January 2008. As Fred Banks testified, nothing in the Court’s April 6, 2007 Memorandum Opinion and following Order gave indication that the sanctions would be postponed until later in the case or after trial. It can be inferred that Leo did not share this prediction with the other Eaton lawyers because Leo realized this “100% prediction” would cause them to raise questions about Peters’ ex parte communications with Judge DeLaughter. Delaying sanctions not only avoided embarrassment to Eaton and its counsel but also hindered the possibility of case dismissal or Defendants’ interlocutory appeal for failure to dismiss.
[[Image here]]
*758 (j) In the fall of 2007, Schaalman instructed Peters to contact the Court to attempt to alter the trial date to accommodate the wedding of Leo’s son, and received reports that included the possibility of moving an entire criminal docket.
(k) In October of 2007, Peters was involved in Eaton’s actions to remove Special Master Dunbar from this civil case and Judge Tom Lee from the criminal ease against the engineers. As to Judge Lee, not only had he dismissed most of the U.S. Government’s criminal case against the engineers, but on October 11, in advance of the scheduled October 29, 2007 criminal trial date, he contacted Judge DeLaughter and secured De-Laughter’s continuance of the engineers’ depositions until after the criminal trial. Eaton believed that Judge Lee “might not have an open mind” regarding the criminal case. Eaton discussed the possibility of meeting with Judge Lee to express Eaton’s concerns and to request his recusal from the criminal case. Before approving this approach, Leo wanted to be sure that Judge DeLaughter was comfortable with such a meeting.
On October 16, Leo emailed his superior, Eaton General Counsel McGuire, for his input in this decision whereby a non-party would suggest that a federal judge in a criminal case should recuse himself. Leo’s email states that there had been an ex parte contact by Peters with DeLaughter to address Leo’s concern about this proposed meeting: “Judge DeLaughter felt uncomfortable about the contact from Judge Lee and certainly Ed Peters has taken his temperature on this meeting and he is recommending that we go forward with it.” This email shows that Leo and McGuire knew that Peters was having improper ex parte communications with Judge De-Laughter. Peters told the FBI that he had engaged in communications with DeLaughter about Judge Lee’s request relating to the depositions. Reuben Anderson expressed that he was “shocked” by Leo’s statement and “gravely concerned” because [the statement] clearly conveyed to the reader that Peters had improper contact with DeLaughter.
Eaton’s argument that this inquiry to Judge DeLaughter had no relationship to this case is not credible. Eaton’s interest was apparently to whether seeking to remove Judge Lee might affect DeLaughter’s involvement and rulings in this case. Eaton’s desire to remove Judge Lee might affect DeLaughter’s involvement and rulings in this case. Eaton’s desire to remove Judge Lee was obviously prompted by Judge Lee’s October 11 letter to Judge DeLaughter about continuance of the engineers’ depositions.
(I)Leo and Schaalman concealed information relating to Peters’ ex parte communications from Eaton’s local counsel — Fred Banks and Reuben Anderson. Banks and Anderson testified that they did not know about communications by Peters with DeLaughter or Mary Gaines. Greg Everts also testified that he did not know about the communications. Anderson was the lawyer designated to try this case and should have been fully apprised of all matters related to scheduling a trial date so as to accommodate his schedule.
It is reasonable to infer that Leo and Schaalman recognized the impropriety of those communications and feared that Banks, Anderson, and Everts would ask questions which might reveal or interfere with the improper ex parte communications. Anderson testified that if he had known about the contacts, he would have initiated some investigation.
*759 ¶ 73. In Barrett v. Jones, Funderburg, Sessums, Peterson & Lee, LLC, 27 So.3d 363, 370 (Miss.2009), this Court reiterated that a trial court “has inherent power to impose sanctions in order to protect the integrity of the judicial process.” And we stated:
Of particular relevance in this case, Uniform Rule of Circuit and County Court Practice 1.10 provides that “no person shall undertake to discuss with or in the presence or hearing of the judge the law or the facts or alleged facts of any case then pending in the court or likely to be instituted therein, ... nor attempt in any manner, ... to influence the decision of the judge in any such case or matter.” Uniform Rule of Circuit and County Court Practice 1.03 provides that any person embraced by the rules who violates any provision of the rules “may be subjected to sanctions, contempt proceedings, or other disciplinary actions imposed or initiated by the court.”
Id. at 370. In Barrett, the trial court found that members of a joint venture, Scruggs Katrina Group, were vicariously liable for partner Richard Scruggs’s bribery attempt and other misconduct, therefore dismissing the underlying action. We reversed the trial court’s dismissal, finding that there was “no evidence of ‘red flags’ that should have alerted the [other members/partners] to Scruggs’s activities.” Id. at 376.
¶ 74. Unlike in Barrett, we find the evidence here clearly and convincingly shows that Eaton, through its officers, knew that Peters had engaged in improper ex parte communication with Judge De-Laughter on Eaton’s behalf to advance Eaton’s interests in this lawsuit. And we reject all of Eaton’s above-mentioned contentions to the contrary. The aforementioned findings, along with other findings contained in Dogan’s August 11, 2010, R & R, as adopted by the circuit court, are fully supported by the record.
¶ 75. As Dogan sharply concluded in his August 2010 R & R, this misconduct prejudiced not only Frisby, but “has prejudiced the administration of justice and the integrity of [its] proceedings.” And we find no abuse of discretion in the trial court’s ultimate decision to right that wrong by issuing the most severe sanction at its disposal — dismissing with prejudice Eaton’s lawsuit against Frisby.
¶ 76. This issue is without merit.
III. Whether Eaton is entitled to a new trial on the motion to dismiss because the procedures the circuit court invented and used violated Eaton’s rights in multiple ways.
¶ 77. Eaton contends that its due-process rights were denied by not being allowed an evidentiary hearing presided over by a specially appointed judge from outside Hinds County, in which it could present evidence showing the legitimacy of Peters’s work for Eaton.
¶ 78. This issue is without merit. As the trial court found, both parties were provided ample notice that a special master would be preside over depositions and render rulings that would stand as rulings of the court. The circuit court’s massive docket with limited staff on this case necessitated the use of a special master. And it was Eaton who initially requested a special master and agreed to the procedures thereby used after Frisby filed its first motion to dismiss. Further, both parties were given the opportunity to present oral arguments to the trial court prior to the imposition of sanctions.
*760 CONCLUSION
¶79. The circuit court’s imposition of monetary sanctions for discovery abuses and its decision to dismiss Eaton’s claims against Frisby are affirmed.
¶ 80. AFFIRMED.
WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, KING AND COLEMAN, JJ„ CONCUR.

. In their respective briefs, the parties sometimes refer to this privilege as a joint defense privilege or common litigation privilege.

. In the February 9, 2009 R & R, Dogan rejected the credibility of the ex parte testimony offered by Eaton in an effort to “explain away” the documents. "This document, even with the explanatory testimony from Messrs. Banks, Anderson, Schaalman and Leo, states in black and white that there was a nonadministrative contact initiated by Eaton counsel, Ed Peters, with Judge DeLaughter.”

. Frisby filed a "Motion To Correct Physical Copies of Record Excerpts Filed By The Fris-by-Related Parties.” This motion is granted.

. We note that, in the December 2006 R & R, Dunbar made the following commendation with regard to Emily Feinstein, one of Quarles & Brady’s young associates: "We must give high marks, both in law and ethics, to Feinstein, who immediately understood that the Consulting Agreement and the payments reflected in the Georgeff communications were discoverable and should be at least identified.”