# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-WC-00040-COA

**CHARLES HAWTHORNE**

**APPELLANT/ CROSS-APPELLEE**

**v.**

**MISSISSIPPI STATE HOSPITAL**

**APPELLEE/ CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/07/2021 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEY FOR APPELLANT: | K. CAROLINE BOYD |
| ATTORNEYS FOR APPELLEE: | MICHAEL D. YOUNG ANDREW W. ALDERMAN |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 05/02/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.     A police officer was employed by the Mississippi State Hospital.  He sustained injuries to his knee after attempting to restrain a patient.  As a result, he filed a workers' compensation claim.

¶2.     The administrative judge then ordered an independent medical evaluation.  The IME order explicitly prohibited ex parte communication between the attorneys and the doctor or the doctor's staff.  Nonetheless, counsel for the hospital contacted the doctor.  After the phone call, the doctor amended his report, deleting a line about a knee injury.

¶3.     Counsel for the claimant discovered what happened and filed a motion for sanctions

related to the ex parte communication. On review, the Mississippi Workers' Compensation Commission found the ex parte contact violated the IME order. As a result, it struck the amended report and ordered the Employer and Carrier to pay all costs related to the doctor's deposition. The Commission also determined the claimant suffered a 40% loss of industrial use of his left lower extremity.

¶4. Despite prevailing below, the officer appealed, arguing the sanctions should have been more severe. The Hospital cross-appealed the finding of loss of industrial use. Finding the Commission acted within its discretion on both points, we affirm.

## BACKGROUND

¶5. Charles Hawthorne was 48 years old and worked as a campus police officer at the Mississippi State Hospital. His job duties included checking buildings, walk-throughs, and other security procedures. He was also responsible for responding to "calls [for] assistance from the . . . nurses in the building to help . . . restrain patients that [were] out of control."

¶6. While on duty, he received such a call—that "one of the patients was getting irate." During the restraint of the patient, "another officer or somebody fell on [Hawthorne's] knee." He recalled hearing a "popping" sound and being in "a lot of pain."

¶7. He was taken to Merit Health by ambulance, where he was diagnosed with a dislocated knee. As a result, Hawthorne was sedated, and his knee was pushed back into place.

¶8. Days later, he was evaluated at TrustCare for ongoing pain in his left knee. The doctor noted the formerly dislocated knee and arranged for him to see an orthopedic surgeon.

2

The doctor also noted Hawthorne had undergone hip surgery in 2005.

¶9.     Hawthorne was then referred to Mississippi Sports Medicine and Orthopedic Center for an evaluation.  The officer was first treated by Dr. Robert Mehrle, the doctor who had performed his previous hip surgery.  Dr. Mehrle noted Hawthorne's pain interfered with his daily activities.  Because of the severity of the officer's pain, the doctor gave him an injection and referred him to physical therapy.  But there was no significant improvement.  The officer told the doctor he experienced continued pain in his left knee and difficulty with motion despite participating in physical therapy.

¶10.    Hawthorne was then referred to Dr. Jason Craft, who ran another MRI.  He told the doctor he was experiencing "moderate pain" and "catching and popping in his knee."  The officer also complained of hip pain, but his clinical exam demonstrated his left hip was in good condition.

¶11.    Dr. Craft ultimately decided to perform surgery on Hawthorne's left knee.  After the surgery, the doctor noted his range of motion and stability were good and placed him at maximum medical improvement.  He also assigned a 3% impairment rating regarding Hawthorne's knee.  He then completed a Functional Capacity Evaluation.  In his report summarizing the FCE, Dr. Craft noted, "[Hawthorne] is able to work in the sedentary to light capability range with limitations on standings, walking, kneeling, stair climbing, floor to waist lifting and crouching."  Further, Dr. Craft noted Hawthorne was "slow walking as evidence[d] in [his] 6 min[ute] walk test requiring an assistive device with difficulty weight bearing on [his] left knee."

¶12.    Hawthorne then filed a motion to compel medical treatment regarding his left hip.  In response, the administrative judge ordered the officer to undergo an independent medical evaluation of both his knee and hip by Dr. Matthew Futvoye.  The IME order set out several conditions.  Part of the order explicitly prohibited ex parte contact between the attorneys and the doctor.

> [T]he attorneys shall refrain from conducting *ex parte* communications with the physician and/or any member of the physician's staff about this matter, except as otherwise provided herein. The only communication with the physician allowed by this Order is the setting, cancelling, or rescheduling of the appointment and/or any other ministerial duties. The attorneys are specifically prohibited from submitting separate letters to the physician with questions to be addressed, unless authorized by the Administrative Judge.

¶13.    Dr. Futvoye issued a report of his IME of Hawthorne.  He stated the officer was at maximum medical improvement and had a 3% degree of impairment.  He concluded, "As far as permanent restrictions, given the fact that the patient has this knee injury, I think it would be reasonable for him to return to moderate duty work."  The doctor also reported he did not "think that the patient's left hip complaint's [sic] were aggravated to any significant degree with the injury he sustained in March of 2018."

¶14.    The doctor amended his report that same day.  The new report completely deleted the sentence acknowledging the knee injury and its impact on Hawthorne.

¶15.    Later during a telephonic conference, the AJ asked the attorneys about the doctor's amended report.  Michael Young, counsel for the Hospital, admitted he contacted Dr. Futvoye's nurse about the report.  However, he explained it was just to correct what he called a "typo."

¶16. Hawthorne then filed a motion for sanctions. He argued the ex parte communication by counsel for the Hospital with Dr. Futvoye's nurse was a "direct violation of the Administrative Law Judge's Order." He argued the doctor's changes to his report were not simply "typographical changes in nature." In his view, since the amended report deleted a sentence, it appeared counsel for the Hospital "asked for the knee restrictions to be replaced by the hip restrictions." He stated he "had no choice but to take the deposition of Dr. Futvoye to obtain clarification of his opinions and to further investigate the conversation that occurred between Michael Young and Dr. Futvoye's office." Hawthorne then asked the AJ "to provide payment for Dr. Futvoye's charges associated with the deposition as well as court reporting expenses as this deposition would not have been necessary had it not been for Mr. Young's violation of the Administrative Law Judge's Order." He expressed this violation in turn "caused an injustice and delay."

¶17. Counsel for the Hospital responded that he only called the doctor's office over what he called a "scrivener's error," as the deleted language contradicted other language in the report. He also stated that during his deposition, Dr. Futvoye "continuously denied any specific request from a certain party to provide the amended report." The attorney contended the amended report instead "made absolutely no change to the substance of [Dr. Futvoye's] findings." He insisted the changes merely "described the findings more clearly, without any such 're-designation.'"

¶18. The AJ determined the lawyer had not engaged in improper ex parte communication with the nurse. The AJ concluded "it was apparent throughout the doctor's deposition

testimony that there was no underhandedness involved." As to the merits, the AJ found Hawthorne had "not suffered an industrial loss of use from [his] work-related injury."

¶19. Hawthorne sought review from the Full Commission. The Commission ruled the ex parte communication between counsel for the Hospital and the doctor violated the AJ's IME order. The Commission first defined a scrivener's error as an "error resulting from a minor mistake or inadvertence, esp[ecially] in writing or copying something on record, and not from judicial reasoning or determination." Based on this definition, the Commission found because the amended report "warranted possible clarification or correction," it could not be characterized as a ministerial task or scrivener's error.

¶20. The Commission then explained if an attorney believed there was an error, "the proper protocol would be a joint letter to either the Administrative Judge or IME physician with copies to both sides." Since the communication violated the IME order, the Commission struck the amended IME report and ordered the Hospital to pay all costs related to the doctor's deposition.

¶21. One commissioner dissented in part to the order, finding higher sanctions should be imposed. In the view of the dissent, the Commission should "strike both the IME opinions from the record and sanction the Employer/Carrier in the amount of $1,000.00." The dissent saw this was warranted due to the "gravity of the conduct to rise to a level that sanctions are required," since the ex parte contact "resulted in the contamination of [the] IME opinion."

¶22. The Commission further ruled Hawthorne "sustained a 40% loss of industrial use of the left lower extremity." In making this ruling, the Commission gave "more weight" to Dr.

Craft's opinions, as he was Hawthorne's treating physician. It specifically honed in on his FCE report, which limited the officer to sedentary to light-duty work. The Commission found that while Dr. Futvoye opined the officer is capable of moderate duty work, his opinion was "at least partially based on an inconsistent review of [Hawthorne's] valid FCE."

¶23. The Commission also considered Hawthorne was "48 years old, and his prior work history exclusively consists of law enforcement duties" since 1999. It also referenced Dr. Craft's characterization of this line of work as "heavy-duty employment." After considering Hawthorne's "age, education/experience, work restrictions, and continued complaints of pain," the Commission stated the officer was "unable to perform the substantial acts of his usual employment due to his work injury and limitations assigned as a result."

### STANDARD OF REVIEW

¶24. "In Mississippi, our Court employs an abuse-of-discretion standard in reviewing the trial court's grant or denial of sanctions." *Ill. Cent. Gulf R. Co. v. McLain*, 174 So. 3d 1279, 1284 (¶12) (Miss. 2015). "We will affirm a trial court's decision unless we have a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors" *Id*. However, questions of law are reviewed de novo. *Jones v. Univ. of Miss. Med. Ctr.*, 309 So. 3d 1135, 1143 (¶33) (Miss. Ct. App. 2021).

¶25. Furthermore, "[o]ur appellate review in a workers' compensation case is limited to determining whether the Commission's decision was supported by substantial evidence, was arbitrary and capricious, was beyond the scope or power of the agency to make, or violated

7

the claimant's constitutional or statutory rights." *Id*. at 1142 (¶33). "In particular, we review the facts on appeal not with an eye toward determining how we would resolve the factual issues were we the triers of the fact; rather, our function is to determine whether there is substantial credible evidence which would support the factual determination made by the Commission." *Id*. (internal quotation mark omitted). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion." *Id*. "If there is such substantial credible evidence, we are without authority to disturb that which the Commission has found, even though that evidence would not be sufficient to convince us were we the factfinders." *Id*. at 1142-43 (¶33) (internal quotation mark omitted). "On appeal, we review matters of law before the Commission de novo, while according the interpretation of the Commission great weight and deference." *Id*. at 1143 (¶33) (internal quotation mark omitted).

## DISCUSSION

### I. The Commission acted within its discretion by sanctioning counsel for the Hospital.

¶26. Despite prevailing below, Hawthorne asserts that the Commission should have levied stronger sanctions against the Employer and Carrier for the improper ex parte contact. In large part, he urges this Court to adopt the position of the dissenting commissioner, who would have struck both reports and issued a monetary sanction. In response, the Hospital protests there is no rule that supports sanctioning an attorney for improper ex parte communication.

¶27. "There is no principle more fully established in our jurisprudence than this, to wit, the

8

judgment of a court of competent jurisdiction, acting within the scope of its jurisdiction, is binding and conclusive upon all the world, until its judgment has been reversed or set aside by itself or by some superior tribunal having authority for that purpose." *Ex parte Adams*, 25 Miss. 883, 886 (1853). Therefore attorneys and parties must without fail obey orders of a court of competent jurisdiction, or risk the consequences. *See Stuckey v. The Provident Bank*, 912 So. 2d 859, 869 n.5 (Miss. 2005) ("[a]ttorneys and parties should not complain about the consequences when they consciously fail to adhere to our trial judges' orders").

¶28. If a lawyer or litigant perceives that a ruling by a court is incorrect, there are well settled rules to request review or reconsideration; until changed, the orders must be followed. *See* MRCP 54(b) (Until a decision is certified as final it "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties."). For instance, Mississippi Rule of Civil Procedure 59(e) explains how one seeks to alter or amend a judgment; under Mississippi Rule of Civil Procedure 60(a), one can seek to amend clerical mistakes in judgments, orders, or other parts of the record. Furthermore, after a case is final, one can appeal it pursuant to Mississippi Rule of Appellate Procedure 4, and if a judgment is not final, one may seek interlocutory review pursuant to Mississippi Rule of Appellate Procedure 5.

¶29. And our Rules of Professional Conduct explicitly allow an attorney to challenge rulings of court "based upon an assertion that no valid obligation exists." MRPC 3.4(c). However, a lawyer must be mindful that any such argument must be based on "a good faith argument for an extension, modification or reversal of existing law." MRPC 3.1. For

9

"[w]hile it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process." *Preamble*, MRPC.

¶30.    But until such time as an order is reversed, modified, or amended, it must be followed without fail.  As courts must expect compliance with their orders, our law recognizes any violation of an order comes at great risk.  "A court has the inherent power to impose sanctions in order to protect the integrity of the judicial process." *Barrett v. Jones, Funderburg, Sessums, Peterson & Lee, LLC*, 27 So. 3d 363, 370 (¶25) (Miss. 2009). "[W]here there is no specific authority for imposing sanctions, courts have an inherent power to protect the integrity of their processes, and may impose sanctions in order to do so." *Wyssbrod v. Wittjen*, 798 So. 2d 352, 368 (¶58) (Miss. 2001); *see also Ladner v. Ladner*, 436 So. 2d 1366, 1370 (Miss. 1983) (holding that sanctions may be imposed "even without a prior court order").

¶31.    To this longstanding general law, the Commission has specifically developed procedures to prohibit tinkering with the IME process.  After all, it is an *independent* medical examination.  So "non-consensual ex parte contact with treating physicians may not be initiated by the Employer, the Carrier, their legal representatives or agents" after litigation has begun.  *Hinson v. Miss. River Corp.*, No. 94-19422-F-4717, 1996 WL 34900915 at *7 (Miss. Workers' Comp. Comm'n Aug. 1, 1996).  "This is because nonconsensual ex parte contact is not a formal discovery method authorized by [the applicable Rules adopted by the Commission], and once a controverted claim has been commenced, information is to be discovered or obtained only in accordance with those Rules." *Id*.  While the exclusion of

10

evidence is not the exclusive remedy for non-consensual ex parte contact, it "may be considered a possible remedy" if "the particular facts justify." *Id*. at *9.

¶32.    In the end, there is a well-settled rule: "Our trial judges also have a right to expect compliance with their orders, and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril." *Bowie v. Montfort Jones Mem'l Hosp.*, 861 So. 2d 1037, 1042 (¶14) (Miss. 2003).

¶33.    The above ably demonstrates that our court system prohibits violating court orders. Indeed for our system of justice to endure, all those involved—especially lawyers—must obey them.  Here the IME order expressly prohibited ex parte contact, stating the attorneys shall refrain from conducting ex parte communications with the physician and/or any member of the physician's staff.

¶34.    Despite this clear admonition, counsel for the Hospital contacted the office of the IME physician.  His ex parte contact is uncontested, as counsel admitted to the AJ he contacted the nurse in seeking to have the IME report changed.  Furthermore, the ex parte communication between the attorney and the nurse caused issues in the discovery phase. After Dr. Futvoye amended his IME report, counsel for Hawthorne was forced to depose the doctor because there was confusion regarding the source of the injury, causing a delay in the proceedings.

¶35.    In its discretion, the Commission saw fit to impose a minimal sanction of striking the amended IME report and ordering the Employer and Carrier to pay all costs associated with the doctor's deposition.  Under our jurisprudence, the Commission had the authority to

11

remedy the violation in this manner. While Hawthorne may be dissatisfied with the Commission's sanctions, the law does not provide that monetary sanctions against a party are *mandatory* as a result of noncompliance with a court order. Our law vests trial courts and tribunals with considerable discretion to protect the integrity of the judicial process. Because the sanctions were not a clear error of judgment, we find the Commission did not abuse its discretion.

¶36. Since the inception of our state, our jurisprudence has expected and required compliance with orders of a court. The Hospital cannot now complain of the consequences of its lawyer trespassing these longstanding boundaries. At no point was the AJ's order setting the IME reversed, modified, or amended, and therefore it was mandated to be followed to the letter. The Commission has the authority to sanction an attorney for a violation. *See* Miss. Code Ann. § 71-3-59(2) (Rev. 2021).

¶37. Given our precedent commanding compliance with court orders and the considerable discretion the Commission has to remedy such violation, we find the Commission did not abuse its discretion.

## II. The Commission acted within its discretion by finding Hawthorne sustained a 40% loss of industrial use of his left lower extremity.

¶38. The Hospital cross-appeals, arguing the Commission erred in finding a 40% loss of industrial use of his left lower extremity. Specifically, it argues the Commission's finding was not supported by any medical evidence and was in direct contradiction to the opinions of the treating physician and the IME physician.

¶39. This is simply not the case. Hawthorne was a 48-year-old man who had worked in

12

law enforcement for nearly twenty years. As noted by his treating physician, this line of work is characterized as heavy duty. At the time of his injury, he worked as a campus police officer at the Mississippi State Hospital. His job duties included conducting building checks, walk-throughs, and security checks. He also helped to "restrain patients that [were] out of control." However after sustaining the work injury, he consistently complained of knee pain and had to undergo knee surgery.

¶40. Hawthorne's treating physician noted he was only capable of working in the sedentary to light-duty range. The officer showed limitations on standing, walking, kneeling, stair climbing, floor-to-waist lifting, and crouching. Hawthorne's evaluation also revealed he was slow walking and required an assistive device because he was unable to put substantial weight on his knee.

¶41. While the Hospital argues Dr. Futvoye's FCE report stated Hawthorne was capable of moderate-duty work solely related to his pre-existing hip issue, the treating physician came to a different conclusion. He instead found substantial limitations with regard to Hawthorne's knee and released him to sedentary to light-duty work. The Commission was ultimately vested with the authority to evaluate and weigh each of the doctors' findings regarding Hawthorne's functional capability and its source. And in doing so, it gave greater weight to the treating physician's findings. "[T]his Court has held that where there is conflicting medical testimony, the Commission has the responsibility to apply its expertise and determine which evidence is more credible." *Duren v. Effex Mgmt. Sols. LLC*, 342 So. 3d 481, 493 (¶56) (Miss. Ct. App. 2022) (internal quotation mark omitted). "Accordingly,

where medical expert testimony is concerned, the supreme court has held that whenever the expert evidence is conflicting, the Court will affirm the Commission whether the award is for or against the claimant." *Id*. (internal quotation mark omitted).

¶42.  Considering Hawthorne's age, experience, and the treating physician's report, the Commission found the officer was unable to perform the substantial acts of his usual employment.  The evidence as a whole indicates the finding of the Commission was supported by substantial credible evidence.  Therefore, we will not disturb its ruling on appeal.

### CONCLUSION

¶43.  We find the Commission acted within its discretion by sanctioning counsel for the Hospital.  We also find the Commission acted within its discretion by finding a 40% loss of industrial use of the claimant's left lower extremity.

¶44.  **ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**